JACK JONES AND LORENE JONES, D/B/A JONESY'S MOBILE HOME SALES AND ADDISON INDUSTRIES, INC. *v.* RICHARD C. ABRIANI AND JAYANNE B. ABRIANI.

[No. 1-575A92. Filed June 29, 1976.]

558

*Frederick T. Bauer, Bauer, Miller & Bauer,* of Terre Haute, for appellants.

*James P. Savage,* of Clinton, for appellees.

LOWDERMILK, J.—This action arose as the result of the sale of a defective mobile home by defendants-appellants Addison Industries, Inc. (manufacturer) and their agents, Jack Jones and Lorene Jones, d/b/a Jonesy's Mobile Home Sales (sellers) to plaintiffs-appellees Richard and Jayanne Abriani (buyers). The Abrianis recovered judgment of $5,000.00 compensatory damages and $3,000.00 punitive damages, and the defendants appealed, claiming that the judge's decision was not sustained by sufficient evidence and was contrary to law.

An examination of the facts viewed in the light most favorable to the trial court's judgment, reveals the following. Richard and Jayanne began shopping for a mobile home in the spring of 1971 just prior to their marriage. They viewed several models on various occasions in the Terre Haute and Indianapolis areas, and finally settled on the Spanish style Eagle mobile home that was on display at Jonesy's Mobile Home Sales because "it was fancier than most we had seen, and . . . looked to be better constructed than most we looked at for the price." Since a new mobile home could be purchased for the same price as the model home they had viewed they decided to order a new home rather than purchasing the display unit. The new home was to be identical with the model home but for a few optional accessories and different colored sinks and carpeting.

A contract to purchase was signed by Richard. Jayanne had quickly scanned the document, but Richard himself did not read the contract, later saying "I was young, you know how everybody starts off young and I figured we could at least trust the Jones' or somebody that would watch out for us." A down payment of $1,000.00 was made, and the mobile home was ordered by the sellers from the manufacturer in Alabama.

When the home arrived, the Abrianis inspected the home,

but were disappointed in what they found. The carpet was a different color than the one ordered, a sink was chipped, a curtain was missing, a shutter was missing, the floor plan was different from what had been ordered, the bathrooms did not have double sinks, and in general, the quality of the construction and furnishings was substantially below what they had expected. They immediately contacted Mrs. Jones to tell her that they did not want the home in that condition. She informed them that if they did not take the mobile home they would lose their down payment.

Inasmuch as the Abrianis could not afford to lose the $1,000.00, they decided that they had no choice but to take the mobile home on condition that the sellers would take care of their problems. Sellers installed the mobile home on a lot owned by sellers and rented to the Abrianis.

Over the next year, complaints were made to the sellers every time the rent was paid about the different problems that arose in the mobile home. Sellers eventually replaced the chipped sink, supplied the missing shutter, and connected the dryer vent free of charge. A missing curtain in the bedroom was ordered, but a correct match could not be found so that a whole new set of curtains was sent almost a year later. Although these curtains were the wrong size, the Abrianis were tired of complaining and made no further mention of the problem. Similar difficulty was experienced in gaining delivery of six missing or damaged screens, and only four were eventually received.

About four months after delivery of the home, Jayanne called Mrs. Jones to complain about a leak in the roof. Mrs. Jones informed her that the roof had to be sealed every two years, and Jayanne responded that they had only had the home for a few months, and that it should not need that kind of maintenance so soon. Mrs. Jones refused to fix the leak unless the Abrianis paid for the service. In the same call, Jayanne listed once again all of the other uncorrected problems that they had found in the home after living there for

several months. They discovered that the doors were all crooked and would not shut properly. Further, the carpeting was literally falling apart and had several bald spots and a large cut. The chair was broken inside, causing the upholstery to tear. The bathtubs both leaked. All of the cabinet doors were out of alignment. The holes had been cut too large for most of the light switches. The paneling was starting to fall off, the molding was popping off, the ceiling was being damaged by the leak, there was a gas leak in the furnace, and the hot water heater element went out. There was trouble with the wiring, and a fuse was blown at least once a month. No attempt was made to remedy any of these defects.

About a year later, and after the continual assurances of repairs failed to materialize, the Abrianis wrote the Attorney General seeking help in the matter. They listed all of their complaints, including these additional problems: the bedroom windows would not raise; the window frames seemed to be out of alignment; the sliding doors on the bathtub would not fold correctly; there were no filters with the furnace; the legs on the end tables and coffee table wobbled and were about to fall off; the upholstery on the furniture was all wearing out; both mattresses were cheap and had broken springs; everytime the carpet was vacuumed the sweeper bag filled up with lint.

The only response to the letter that the Abrianis received was a printed warranty card from the manufacturer that provided that the warranty registration had to be returned within five days of purchase in order for the ninety day warranty to be effective. Jayanne had earlier told Mrs. Jones that they had never received any information about the warranty. Since both time limits on the warranty card had long since passed, the Abrianis turned to legal counsel, and this action resulted soon thereafter.

Shortly after the Abrianis sent their letter to the Attorney General, they decided to move their home to a different lot in case any trouble arose because of the letter. At this time,

the moving company pointed out a dent or bow in the A-frame hitch of the home. There was also testimony that one front panel of aluminum siding on the home "looked like it had been repaired and had buckled all up." They also discovered that the aluminum roof panel had large "wrinkles" or bulges in it, although the exact location of the leak could not be determined.

Inasmuch as the defendants have based their appeal on a claim of insufficiency of the evidence, we have found it necessary to recite this rather complete summary of the evidence. From this evidence, the trial judge made detailed findings of fact and conclusions of law, which stated in relevant parts as follows:

"6. That the defendants delivered to plaintiffs at the place of business of JONESY'S MOBILE HOME SALES a defective and damaged mobile home which was not comparable to or within the standards of quality and serviceability of the home exhibited to plaintiffs, but a mobile home which was damaged, with missing accessories of substandard quality and latent defects in construction. That plaintiffs sought to refuse delivery of said mobile home, but were threatened by the defendants Jack Jones and LoRene P. Jones, d/b/a JONESY'S MOBILE HOME SALES, and as agent for ADDISON INDUSTRIES, INC., with the loss of their down payment if they refused to accept the delivery of said home and represented to them that they and the defendant ADDISON could correct the damages and defects in said mobile home.

"(7) The Court further finds that the defendants, with obvious intent to deceive, did not deliver the manufacturer's warranty to plaintiffs, and although demand for same was made from time to time, such manufacturer's warranty was not delivered to plaintiffs until June of 1972 after repeated demands had been made upon the defendants by plaintiffs, including intervention by the Attorney General of the State of Indiana, and until long after the period of warranty enforcement had expired.

"(8) The Court further finds that plaintiffs were forced to accept the delivery of the mobile home from the defendants, being financially committed, and accepted possession of the mobile home only upon the conditions that

the defendants would make good the defects of said mobile home.

"(9) The Court further finds that in addition to the apparent defects in said mobile home, plaintiffs subsequently discovered hidden damage to the frame and proof of the mobile home, which damage was called to the attention of the defendants by notice to Jack Jones and Lorene P. Jones, all of which demands defendants willfully and fraudulently refused to acknowledge, and which damage defendants willfully and fraudulently refused to repair.

"(10) The Court further finds that on March 15, 1972, eleven months after the purchase agreement was signed, defendant ADDISON INDUSTRIES delivered to defendants Jack Jones and LoRene P. Jones, d/b/a JONESY'S MOBILE HOME SALES, two window screens and certain drapery items which were to have been delivered with the mobile home, but at no other time has either defendant recognized any of the plaintiffs' complaints, and they have repeatedly ignored all attempts of plaintiffs to seek relief.

"(11) The Court further finds that after the purchase and delivery of said mobile home, plaintiffs resided in the mobile home park of the defendants Jack Jones and LoRene P. Jones, d/b/a JONESY'S MOBILE HOME SALES. That defendants Jack Jones and LoRene P. Jones, d/b/a JONESY'S MOBILE HOME SALES, and as agent for ADDISON INDUSTRIES, had knowledge of plaintiffs' complaints from time to time, all of which were ignored by defendants to the detriment of plaintiffs.

"(12) The Court further finds that defendants having knowledge of their failure to carry out the warranty of the mobile home purchased, and having been repeatedly requested and demanded to take care of their contractual obligations to plaintiffs, breached their contract and by false representations and fraud attempted to cancel their relationship and their contractual duties to plaintiffs, all to plaintiffs' damage.

"(13) The Court further finds from the facts that plaintiffs should be awarded compensatory damages and punitive damages in this cause."

When the sufficiency of the evidence is questioned on appeal, the reviewing court will not weigh the evidence but will consider only that evidence most favorable to the appellee together with the reasonable inferences to be drawn therefrom. *Muehlman* v. *Keilman* (1971),

257 Ind. 100, 272 N.E.2d 591. Also ingrained in our appellate practice is the principle that when trial is to the court, the ultimate facts as found by the trial court must be accepted by this court if there is sufficient evidence to support such facts. We may not reverse the judgment unless it is clearly erroneous. *Grissom* v. *Moran* (1972), 154 Ind. App. 419, 290 N.E.2d 119.

Under these standards, we believe it is clear that the substantive portions of the trial court's findings are more than adequately supported by the evidence. While there are a couple of apparently minor errors contained in the court's finding No. 10 with respect to the number of screens that were actually delivered, and with respect to some repairs that were performed, we do not see how a corrected finding could possibly alter the court's overall conclusions. Similarly, a minor error in the court's finding of fact as to the balance due on the contract can have no effect on the court's final conclusions, where that figure is not relied on for the computation of damages. There was more than adequate evidence in the record from which the trial court could infer that there was hidden damage to the home, especially considering the pictures that were entered into evidence, and considering the fact that sellers installed the home on sellers' own lot. The trial court could not simply ignore the evidence of twisted door frames and bulging paneling and trim. We find no significant error in the trial court's findings.

The appellants' only other claimed errors concern the amount of damages awarded by the trial court. They raise issues in regards to the method of determining the compensatory damages, the sufficiency of the proof as to the amount of compensatory damages, and the sufficiency of the proof as to the elements of fraud necessary to sustain the punitive damage award.

It is first necessary to determine the basis of liability.

Inasmuch as the mobile home in question falls within the definition of "goods" as set out in 2-105 of the Uniform Commercial Code, IC 1971, 26-1-2-105 (Burns Code Ed.) [hereinafter cited by UCC numbers only], this sale is governed by the rules set out in Article 2 of the Code.

We first point out that valid grounds for rejection of the mobile home existed in this case under 2-601, the Perfect Tender Rule, which provides that "if goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole. . . ." While tender does not necessarily have to be "perfect," see Whaley, *Tender, Acceptance, Rejection and Revocation—The UCC's "TARR"—Baby*, 24 DRAKE L. REV. 52 (1974), (hereinafter cited as Whaley) the mobile home in this case clearly failed to meet the contract requirements. The seller did have a right to cure minor defects after proper notice according to the terms of 2-508, but the evidence demonstrates that no such cure was ever forthcoming within the contemplated time of performance, or at any time.

Defendants contend that the Abrianis had no right to demand return of the down payment or reject the home as delivered because of the following liquidated damages provision that appears in the sales agreement:

"Upon failure or the refusal of the purchaser to complete said purchase for any reason (other than cancellation on account of increase in price) the cash deposit may have such portion of it retained as will reimburse the dealer for expenses and other losses occasioned by purchaser's failure to complete said purchase. . . ."

The clause is applicable only if a perfect tender has been made. The defendants must first perform their part of the contract of sale before the buyers can be held liable for breach under a liquidated damages clause. *Cf.* Section 2-718. The Abrianis could not fail to complete the purchase until

the defendants performed by tendering the goods to be purchased under the contract terms.

Sellers also contend that the goods were in substantial compliance with the contract, except for the carpeting on which the manufacturer had retained an option to substitute different carpeting under the following clause:

"The manufacturer has the right to make any changes in the model or the designs or any accessories and parts of any subsequent new trailer or mobile home, at any time, without creating an obligation on the part of either the dealer or the manufacturer to make corresponding changes in the trailer or mobile home described and covered by this order either before, or subsequent to, delivery of such equipment to the purchaser."

The clear import of this provision is that the manufacturer is under no duty to provide any accessory or part other than those contained within the original contract agreement. Thus, if an improvement was made in the design of a particular mobile home model, the manufacturer is under no duty to include such new design or improvement on a mobile home that had already been contracted for on the basis of the older design. There is nothing in the clause to suggest that inferior materials may be substituted at the option of the manufacturer after an agreement on the subject matter of the contract has already been reached. Further, it is clear from the facts set out above that there were other substantial defects in the home and variances from the contract terms that would amount to imperfect tender.

We hold that the evidence was sufficient to sustain a finding that a valid rejection was made by the Abrianis, and that the sellers' threats to withhold the down payment were not justified under the law.

The Abrianis' complaint requested rescission of the contract, but it is not clear whether the theory relied on was rejection under 2-601, or revocation of acceptance under 2-608. Ordinarily, acceptance with knowledge of a defect is

made on the reasonable assumption that the non-conformity would be cured. Failure to seasonably cure raises a right to revoke acceptance under 2-608(1)(a).

In the case at bar, revocation of acceptance would have been an acceptable remedy, but we believe that rejection would have been a more appropriate remedy. Here the Abrianis did not make an acceptance as contemplated by the Code, but rather agreed to take possession of the goods until such time as sellers had an opportunity to cure their defective tender. In fact, had it not been for sellers' threats, it appears that the Abrianis would not have voluntarily accepted the goods even if the seller had made assurances that they would repair the defects. The Abrianis were entitled to "try out" the goods to discover defects in the home for a reasonable period before acceptance occurs. 2-606(1). This is especially true where defects are apparent at the time of delivery, the buyer refuses delivery on that basis, the seller makes assurances that he will eventually perform the contract and repair the defects, and the buyer takes possession of the goods to try them out and further inspect the goods to determine if they will ever meet the contract terms. Clearly, that is the case here. Over and over again, the court's have stated that the seller's repeated assurances of cure extend the reasonable time for notice of rejection. *Tiger Moter Co.* v. *McMurtry*, 224 So. 2d 638, 6 UCC Rep. Serv. 608 (Ala. 1969); *Dougall* v. *Brown Bay Boat Works & Sales, Inc.*, 178 N.W.2d 217, 7 UCC Rep. Serv. 1160 (Minn. 1970); *Stephens Indus., Inv.* v. *American Express Co.*, 471 S.W.2d 501, 10 UCC Rept. Serv. 1407 (Mo. Ct. App. 1971); *Lanners* v. *Whitney*, 428 P. 2d 398, 4 UCC Rep. Serv. 369 (Ore. 1967).

In regard to the buyers' use of goods after the notice of rejection, 2-602(2)(a) states that "after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller. . . ." We note that there is no mention of the actual con-

sequences of use of the goods after a valid rejection. Many courts have held that use of the goods converts a rejection into an acceptance, and while that is a reasonable outcome in most cases, we believe the unique facts in the case at bar merit a different conclusion. See Whaley, *supra,* 24 DRAKE L. REV. at 65. The use of the goods by the Abrianis was a result of the oppressive conduct of the sellers at a time when the sellers knew that the Abrianis needed a home and knew that all of their money was invested in the mobile home. While the use of the home by the Abrianis was wrongful as against the seller, such use was the direct result of the oppressive conduct of the sellers in not allowing the buyers to reject, and we do not believe that it is necessary to conclude that use of the goods cancelled the rejection.

Under 2-711(3), the Abrianis had a security interest in the goods for the amount of purchase price paid. The official comments to that section note that price "paid" includes the signing of a negotiable note, as was the case here. The Abrianis had a right to possession of the goods under this section, until their note was returned to them, although they had no right to use the goods, unless it could be found that such use helped preserve the goods through continued care as was the case in *Minsel* v. *El Rancho Mobile Home Center,* Inc. (1971), 32 Mich. App. 10, 188 N.W. 2d 9, 9 UCC REP. SERV. 448. See Whaley, *supra,* 24 DRAKE L. REV. at 65.

The sellers had the burden of showing their damages as the result of any wrongful use by the buyers. Where the decrease in the value of the goods is due to their own defects, rather than the use of the goods by the buyers, there would be little provable damage. *Compare with* 2-608(2).

As noted above, even were we to assume that the Abrianis accepted the home in question, they would still be entitled to revocation of acceptance under 2-608. Certainly it is clear that if any acceptance took place, it must have been made with the reasonable assumption that

the defects would be cured, which is one of the specific grounds set out for revocation of acceptance in 2-608(1). There can be no doubt that the nonconformity in the goods substantially impaired the value of the home to the Abrianis. The Abrianis filed their lawsuit shortly after it finally became apparent that none of the promises made by the sellers would be kept. Finally, there has been no substantial change in the condition of the home other than those changes that resulted because of the home's own defects. Therefore, the conditions of 2-608 have been fulfilled, and revocation of acceptance would be proper. Use of the goods after revocation of acceptance was not fatal here for the same reasons set out above in regards to rejection. *See* 2-608(3) and 2-602(2)(a).

We also find that the Abrianis should be allowed to recover under theories of breach of express warranty and breach of implied warranty of merchantability.

Section 2-313(1)(c) provides that "any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." Thus, the seller expressly warranted that the mobile home contracted for would conform with the model home that the Abrianis viewed at Jonesy's Mobile Home Sales. Additionally, 2-313 (1)(a) provides that "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Thus, the promises made by the sellers to the Abrianis to induce them to accept the mobile home amount to express warranties. The promise that all defects would be repaired is a promise that amounts to an express warranty under 2-313(1)(a), the breach of which gives rise to an action for damages under the Code. Section 2-209(1) provides that "[a]n agreement modifying a contract within this article needs no consideration to be binding."

In addition, the sellers breached the implied warranty of merchantability under 2-314. The term "merchantable" implies that the goods sold will conform to ordinary standards and will be of the same average grade, quality and value as similar goods sold under similar circumstances. *Woodruff* v. *Clark County Farm Bureau Coop. Ass'n* (1972), 153 Ind. App. 31, 286 N.E.2d 188. Additionally, goods must be at least such as are fit for the ordinary purposes for which such goods are used. See 2-314(2) (c). An implied warranty of merchantability is imposed by operation of law for the protection of the buyer, and must be liberally construed in favor of the buyer. *Woodruff, supra.*

The mobile home in question was clearly below average, of poor quality, and was not fit for its ordinary purpose, i.e., to serve as a modern, comfortable home where one can entertain guests without being embarrassed about bald carpets, crooked doors, and a leaky roof.

The contract did contain some language to the effect that "there are no warranties expressed or implied" made by the seller, but such language is clearly ineffective in this case. Under 2-316(2), a written exclusion or modification of the implied warranties must be conspicuous and mention the word "merchantability." Here, there was no mention of the word "merchantability."

Additionally, the disclaimer language must be conspicuous. In *Jerry Alderman Ford Sales, Inc.* v. *Bailey* (1973), Ind. App., 294 N.E.2d 617, this court held that where a purported exclusion or disclaimer of express and implied warranty was located at the bottom of the reverse or second page of the contract, and such page did not require or contemplate the signature of the buyer, the court could properly find that the purported exclusion or disclaimer was not sufficiently conspicuous. Further, 1-201(10) provides that the question whether a term or clause is conspicuous is for decision by the court. See *Jerry Alderman Ford Sales, Inc.* v. *Bailey*

(1973), Ind. App., 294 N.E.2d 617. Here, while the disclaimer was underlined (as was nearly half the page), we believe its placement on the reverse side of the form buried in a whole page of fine print, made such disclaimer inconspicuous, rather than conspicuous, and thus ineffective as a matter of law.

Further, the disclaimer of the express warranty was ineffective under 2-316(1). That section provides that if it is unreasonable or impossible to construe the language of an express warranty and the language of a disclaimer as consistent, the disclaimer becomes inoperative. *Woodruff* v. *Clark County Farm Bureau Coop., supra.*

In summation, we find that grounds for relief were made out on at least four different theories: refusal to recognize a valid rejection; refusal to recognize a rightful revocation of acceptance; breach of express warranty; and breach of implied warranty of merchantability. It is not clear on what theory the trial court awarded relief of $5,000.00 compensatory damages. In regards to the first two theories, buyers were entitled to cancellation of the contract under 2-711, and any other damage they could show under that section or section 2-713. In the alternative, they were entitled to damages for breach of warranty under the second two theories, the measure of which is controlled by 2-714, which provides as follows:

"(1)   Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2)   The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3)   In a proper case any incidental and consequential damages under the next section may also be recovered."

There was no request for, nor proof of, any incidental or consequential damages. In regard to defendants' breach of express and implied warranties, the measure of damages is clearly the difference between the value of the goods accepted, and the value the goods would have had, had they been as warranted. The sellers made express warranties that they would repair any defects in the home. In this case, one reasonable way of measuring the difference in the value of the goods between what was actually delivered (a defective mobile home) and what was warranted (a mobile home with the defects repaired) is the cost of repairing the defects. Thus, the evidence in the record that shows the cost of repairs to be $3,000 to $4,000 would be sufficient to uphold the trial court's verdict as to $4,000 compensatory damages. Also, section 2-714(2) states that the usual rule for breach of warranty (difference in value) will apply "unless special circumstances show proximate damages of a different amount." In *Southern Concrete Products Company* v. *Martin* (1972), 126 Ga. App. 534, 191 S.E.2d 314, the court upheld an award of damages for the cost of repair of the goods much higher than the original cost of goods, where the buyer used the goods only because the seller assured him that the seller would make good the cost of bringing the goods into conformity with the contract. The court found that the buyer's reliance on such assurances were "special circumstances" that showed proximate damages in a different amount. Under the circumstances of this case, both theories support our holding that cost of repair is a correct measure of damages.

While rejection or revocation of acceptance is available to the plaintiffs in this case, we cannot say that those are the only reasonable remedies for such a wrong. Where the plaintiffs have wrongfully used an item for a substantial length of time after a valid rejection or revocation of acceptance has taken place, as in the case at bar, it may be appropriate for the trial court to let the parties accept the goods and then receive damages for the cost of

repairs, rather than rescinding the contract. Such relief is reasonable in the case at bar, and absent objection from plaintiffs, we will not disturb such a finding.

While the testimony as to the actual cost of repairs may not be as precise as defendants would like, the difficulty in measuring cost of repair is due in no small part to the nature of the damages. There is no question but that substantial defects are present in the mobile home, and that real and substantial damage has been suffered by the Abrianis, as opposed to purely speculative elements of damage that the courts usually frown upon. Given the nature of the damages, we feel the estimate given in the case at bar was sufficient. Defendants' arguments to the contrary that rely on their own witness' testimony asks us to reweigh the evidence, something we cannot do.

Defendants also claim that the Abrianis failed to mitigate damages, inasmuch as they spent only $6.25 for repairs up to the time of trial. However, we find that there was no request by the Abrianis for the recovery of incidental or consequential damages because of the leaky roof or other defects, and there was no showing by the defendants that any such simple repair would have prevented the accrual of further damages to the mobile home at any time, inasmuch as substantially all of the damages requested involve only the defects themselves. The sellers contend that the damage to the mobile home resulted because of improper installation of the home after the Abrianis moved it to their own lot. However, it is clear that the defects appeared while the home was at the sellers' mobile home court after being installed there by the sellers. Further, there was expert testimony that the home was properly installed at the new location, and that periodic checks were made to make sure the home remained level. In addition, Richard Abriani repaired many small defects himself in an effort to make the home more livable.

Mitigation of damages is a matter of defense, and the burden of proof is on the defendants to show that such miti-

gation was necessary. *Hirsch* v. *Merchants National Bank* (1975), 166 Ind. App. 497, 336 N.E.2d 833. No such showing was made by the defendants, nor is there any evidence in the record to even suggest that such mitigation would have limited future damages. It was the defendants' duty under their warranty to repair defects in the mobile home and that is all that the Abrianis are asking. The fact that the Abrianis spent $6.25 for repairs does not change that result.

The Abrianis showed that they suffered substantial damages; however, they failed to properly quantify the cost of repairing each of the defective items, no doubt due to the fact that they were seeking rescission of the contract at the time of trial. Since no cross-appeal was taken, we must assume that they acquiesced in the trial court's award of damages in lieu of rescinding the contract. We have already noted that the only cost of repair proven at trial was that it would cost $3,000 to $4,000 to fix up all of the defects in the trailer. Thus, the proven damages amount to only $4,000. There was no estimate as to the cost of repairing or replacing the damaged furniture in the trailer, and thus any award of damages for this item is clearly speculative in nature and cannot be allowed.

Similarly, there is no indication that the requested amount of attorney fees was ever proven to or awarded by the trial court. We note that attorney fees are now a proper element of damages in certain instances under the 1975 amendments to 2-721, the "remedies for fraud" section. See Acts 1975, P.L. 276, § 1, p. 1523. We need not determine the application of these amendments to the case at bar.

We are thus forced to conclude that the evidence will sustain compensatory damages only in the amount of $4,000, and not $5,000 as awarded by the trial court. Ind. Rules of Procedure, Appellate Rule 15(M) provides in relevant part as follows:

"Any order or judgment upon appeal may be reversed as to some or all of the parties and in whole or in part. The court,

with respect to all or some of the parties or upon all or some of the issues may order:

\* \* \*

(5) in the case of excessive or inadequate damages, entry of final judgment on the evidence for the amount of the proper damages, a new trial, or a new trial subject to additur or remittitur. . . ."

We find it necessary to order remittitur in the amount of $1,000, or in the alternative, that a new trial be granted to the defendants. See *Jerry Alderman Ford Sales, Inc.* v. *Bailey* (1972), 154 Ind. App. 632, 291 N.E.2d 92.

The defendants also claim that the evidence is insufficient to support the award of punitive damages, since an action in fraud was not made out. We first note that actionable fraud need not be proven to support an award of punitive damages. An act committed with a fraudulent state of mind may be such as to subject the actor to liability for punitive damages, even if such act was not conclusively shown to amount to actionable fraud. *Vernon Fire & Casualty Ins. Co.* v. *Sharp* (1976), 264 Ind. 599, 349 N.E. 2d 173; *Jerry Alderman Ford Sales, Inc.* v. *Bailey* (1972), 154 Ind. App. 632, 291 N.E.2d 92; *Rex Ins. Co.* v. *Baldwin* (1975), 163 Ind. App. 308, 323 N.E.2d 270; Note, *The Expanding Availability of Punitive Damages in Contract Actions*, 8 IND. L. REV. 668 (1975). *Contra, Hibschman Pontiac, Inc.* v. *Batchelor* (1976), Ind. App., 340 N.E.2d 377.

While Sellers do not specifically argue the issue of the propriety of awarding punitive damages in a contract action, we deem it appropriate to comment on the issue at this point because of the recent cases decided by our courts. *Hibschman Pontiac, Inc.* v. *Batchelor, supra,* (decided prior to the recent decision of our Supreme Court in *Vernon Fire & Casualty Ins. Co. v. Sharp, supra*) specifically holds that malicious or oppressive conduct will not justify an award of punitive damages in a breach of contract action if there was no showing of conduct amounting to an independent tort. In *Hibschman,*

the court distinguished *Vernon Fire & Casualty Ins. Co. v. Sharp* (1974), 161 Ind. App. 413, 316 N.E.2d 381, and *Rex Ins. Co. v. Baldwin, supra,* on the grounds that they were insurance cases, and were thus exceptions to the general rule that punitive damages are not allowed in contract cases.

The *Hibschman* court also dealt with the following language in *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind. App. 632, 291 N.E.2d 92, *affirmed on rehearing,* 294 N.E.2d 617 (1973):

> "It may be observed that it is quite possible for a single act to constitute not only actionable fraud, if such fraud were alleged, but to constitute as well, evidence of a malicious or fraudulent state of mind on the part of the defendant so as to authorize the award to the plaintiff of punitive damages pursuant to a complaint for contract recission and damages. (sic) (*Murphy Auto Sales, Inc.,* supra) or as here, a complaint for damages for conversion or for breach of a contract of bailment. . . ." 154 Ind. App. at 638, 291 N.E.2d at 98.

The *Hibschman* court viewed this language as follows:

> "We do not interpret recent Indiana cases as expanding recovery of punitive damages to contract actions. The case of *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), [154] Ind. App. [632], 291 N.E.2d 92, *aff'd. on rehearing,* 294 N.E.2d 617 (1973), involved an action for conversion. The precise question before the Court was whether evidence of 'fraud' was properly admitted into evidence. . . .
>
>             *     *     *
>
> Reliance upon *Murphy Auto Sales, Inc. v. Coomer, supra,* which enunciates the general rule that punitive damages are not recoverable in contract actions, would dispel any implication that the above passage was intended to expand the recovery of punitive damages to cases involving breach of contract unaccompanied by tortious conduct. Clearly, evidence of a malicious or fraudulent state of mind was admissible in the *Jerry Alderman Ford* case in connection with the claimed oppressive conversion."

In view of the subsequent Supreme Court decision in *Vernon, supra,* we feel that some of the language in *Hibschman* goes too far, although the facts and result of that case can be

reconciled with *Vernon*. In *Hibschman*, the court seemed to view the facts as demonstrating nothing more than an intentional breach because the seller was either unwilling or unable to repair the automobile to the buyer's satisfaction. It is not clear from the facts as presented whether there was any malicious conduct on the part of the seller. This seems implicit from Judge Garrard's concurring opinion. As the Supreme Court emphasized in *Vernon, supra,* at p. 610, a good faith dispute as to what the contract requires of the seller will never supply the grounds for punitive damages.

This view of the opinion in *Hibschman* is apparently shared by the Supreme Court, inasmuch as *Vernon* cites *Hibschman* for the general rule that punitive damages are not recoverable in a contract action. *Vernon, supra,* at 607. At that point however, the Supreme Court sets out the exceptions to the general rule, as follows:

"The general rule is not ironclad. Exceptions have developed where the conduct of the breaching party not only amounts to a breach of the contract, but also *independently* establishes the elements of a common-law tort such as fraud. *Murphy Auto Sales, Inc.* v. *Coomer* (1953), 123 Ind. App. 709, 112 N.E.2d 589. The requirement that an *independent* tort be found serves several purposes. First, it maintains the symmetry of the general rule of not allowing punitive damages in contract actions, because the punitive damages are awarded for the *tort,* not on the contract. Secondly, the independent tort requirement facilitates judicial review of the evidence by limiting the scope of review to a search for the elements of the tort. Neither of these functions of the independence requirement is very compelling when it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort. The foregoing circumstances alone, however, will not sustain the award of punitive damages. *It must also appear that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated.* Only when these factors coalesce, will the independent tort requirement be abrogated, and the allowance of punitive damages be sustained. A careful review of the case law in this area leads

to the conclusion expressed herein, that an independent tort need not always be established, and the same conclusion is reached in Corbin's treatise:

> 'It can be laid down as a general rule that punitive damages are not recoverable for breach of contract, although in certain classes of cases, there has been tendency to instruct the jury that they may award damages in excess of compensation and by way of punishment. These cases, however, are cases that contain elements that enable the court to regard them as falling within the field of tort *or as closely analogous thereto.*'

5 CORBIN ON CONTRACTS § 1077 (1964) [Emphasis added, footnotes omitted].

"The standard for awarding punitive damages is necessarily a flexible one. Indiana case law follows Sedgwick's formulation which appears in *Taber* v. *Hutson* (1854) 5 Ind. 322, 324:

> '[W]henever the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages; in other words, it blends together the interest of society and of the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender.' [Emphasis added.]

"Sedgwick's recognition that the lines between contract and tort often become blurred is aptly demonstrated by his choice of the word 'mingle' in describing the presence of tortious activity which accompanies the breach of contract. This formulation clearly recognizes that an independent tort is not a prerequisite to the recovery of punitive damages, and we adhere to this standard as a wise one."

Clearly, the Supreme Court's holding cannot be reconciled with the broad language in *Hibschman.*

Applying the *Vernon* test to the facts in this case, it is apparent that the award of punitive damages is justified. This case presents the very problem the *Vernon* court addressed itself to: "a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort." *Vernon, supra,* at p. 608.

Here, the trial court judge made extensive findings of fraudulent and oppressive conduct, but as is often the case, the findings do not specifically set out all five elements of the *tort* of fraud, although there can be no doubt that the evidence was sufficient to support those general findings actually made by the trial court. But as the *Vernon* court noted, this does not end the inquiry. *"It must also appear that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated."* *Vernon, supra,* at p. 608. (Original emphasis.)

▪ The case at bar is a particularly appropriate instance where the public interest is served by the punishment that is inflicted on the wrongdoer. The damages awarded will tend to deter similar conduct in the future against both this buyer and other members of the public who deal with the seller. The application of the rule in this case is not new, as it is well established that punitive damages are particularly appropriate in proper cases involving consumer fraud. *Capitol Dodge, Inc.* v. *Haley* (1973), 154 Ind. App. 1, 288 N.E.2d 766. In fact, it is hard to imagine where the public interest to be served is more important than in consumer matters, especially where the consumer is in an inferior bargaining position and forced to either sign an adhesion contract or do without the item desired. On the basis of the mandate laid down in *Vernon,* we hold that the punitive damage award was proper in this case.

Defendants-appellants belatedly raise an additional assignment of error by means of a supplemental reply brief that was filed with leave of this court. Said brief was filed in response to certain amendments that were made in Abrianis' answer brief, and to an affidavit filed by the Abrianis wherein the trial court judge stated that he had granted a trial motion filed by Abrianis for a view of the mobile home in question, and had denied sellers' motion requesting that the view not be made, or in the alternative, that counsel accompany the court

at the viewing. The judge also stated that he had in fact viewed the mobile home, but had neglected to make the proper entries on the motions or the view itself. The Abrianis were attempting to correct the record to show that the court had indeed viewed the home as they had originally alleged in their answer brief, which allegation had been challenged by sellers.

In their supplemental reply brief, sellers make two arguments: first, the fact that the judge made a view of the mobile home has not properly been made a part of the record; second, that the judge's view of the home without notice to the sellers was reversible error. Since any view of the home could not be considered as evidence in the case, and since we do not rely in any way on the fact that a view was indeed taken, we need not consider whether the view is properly in the record or not.

In regards to the second point, we must assume that sellers are arguing in the alternative, since they cannot reasonably claim it was error for the trial court to view the mobile home without notice, and at the same time deny that any such view ever took place. Inasmuch as we find no reversible error in the trial court's actions, we need not decide whether the alleged error is properly before us.

Sellers rely on the following language in *Yeager and Sullivan, Inc.* v. *O'Neal* (1975), 163 Ind. App. 466, 324 N.E.2d 846, 856, to-wit:

> "It must be noted that whether the trier of fact shall view the premises involved rests in the sound discretion of the trial court; and is not reviewable in the absence of a demonstrated abuse thereof. See: *Jackson Hill Coal, etc., Co.* v. *Bales* (1915), 183 Ind. 276, 108 N.E. 962; *City of Indianapolis etc.* v. *Walker et al.* (1960), 132 Ind. App. 283, 168 N.E.2d 228 (transfer denied).
>
> "The judge's viewing of the premises is not evidence. *Moore v. Ryan* (1919), 188 Ind. 345, 123 N.E. 642. Rather it is permitted so as to enable the court to more clearly understand the evidence given at trial. *DeArmond et al.* v. *Carter d/b/a, etc.* (1956), 127 Ind. App. 34, 134 N.E.2d 239 (transfer denied). Appellants claim to have been prejudiced for the reason that there 'could [be included] things prejudicial to either party or not relevant.' (Appellants'

brief, p. 22) *This, however, falls short of an affirmative showing of an abuse of discretion where appellants received notice that a view was to take place*, see: *Highbarger* v. *Thornock* (1972), 94 Idaho 829, 498 P. 2d 1302; *and did not, thereafter, attend.* Furthermore, while the trial court should have made appropriate docket entries noting the date and time at which the view took place, if in fact it was conducted, appellants have not shown that they were prejudiced by the trial court's failure to do so." (Our emphasis.)

Sellers contend that since they were without notice as to the time of the court's view, that the *Yeager* case should control, and the case should be reversed because of the demonstrated abuse of discretion.

In the case at bar, the trial judge did not let *either* side's attorneys accompany him to the view, unlike the *Yeager* case, but rather specifically barred attendance by the attorneys. The court failed to make the appropriate entries in this regard, but as in *Yeager*, this in itself is not reversible error. Furthermore, we know of no absolute right the sellers had to be present for such a view. In *De-Armond* v. *Carter* (1956), 127 Ind. App. 34, 134 N.E.2d 239, the court refused to reverse when it came to light that the judge had made a *sua sponte* inspection of work completed, holding that reversal was necessary only where the court based its judgment upon information obtained by extra judicial inquiry. In that case, the trial judge indicated right in his judgment that he, "being duly advised in the premises, and having personally inspected the work performed by the plaintiff now finds for the plaintiff."

In the case at bar, we can find no indication that the trial judge relied on his view of the home in resolving any of the factual issues before him. There was ample testimony and pictorial exhibits supporting all of the trial court's findings. Sellers simply alleged general prejudice, but this is insufficient to override the presumption that the court correctly used the view merely to enable him to more clearly understand the evidence given at trial, and not to gather additional evidence so as

to influence his decision. Thus, sellers' reliance on *Highbarger* v. *Thornock* (1972), 94 Idaho 829, 498 P. 2d 1302, is misplaced, as *Highbarger* is clearly distinguishable from the case at bar on the basis of this distinction.

We hold that no prejudice has been shown by sellers, and any error that may have been committed is harmless on the facts of this case.

We affirm the judgment of the trial court insofar as it finds liability upon the part of the appellants and each of them and insofar as it awards punitive damages of $3,000 and insofar as the compensatory damages awarded do not exceed $4,000. We therefore remand the cause with instructions to the trial court to modify its judgment to read as follows:

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the court that Richard C. Abriani and Jayanne B. Abriani recover of and from the defendants-appellants, Jack Jones and Lorene Jones d/b/a Jonesy's Mobile Home Sales and Addison Industries, Inc., separately and severally, the sums of $3,000.00 punitive damages and the further sum of $4,000.00 compensatory damages to be paid to said plaintiffs-appellees by defendants-appellants, Jack Jones and Lorene Jones d/b/a Jonesy's Mobile Homes Sales and Addison Industries, Inc., together with the costs of this action laid out and expended and taxed in the amount of $————."

or in the alternative (in the event plaintiffs-appellees Richard C. Abriani and Jayanne B. Abriani do not consent to the remittitur as herein directed) to grant defendants-appellants a new trial upon all issues.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 350 N.E.2d 635.