## Richmond

### Twin Lakes Manufacturing Company, Inc.

### v.

### Davis F. Coffey, et al.

September 11, 1981.

Record No. 790390.

Present: All the Justices.

*F. Bradford Stillman (McGuire, Woods & Battle,* on brief), for appellant.
*John A. Dezio* for appellees.

POFF, J., delivered the opinion of the Court.

The manufacturer of a mobile home appeals from a judgment awarding the purchasers damages for breach of an implied warranty of merchantability.

The judgment was entered in favor of the purchasers, Davis F. Coffey and Evada J. Coffey, against the appellant, Twin Lakes Manufacturing Company, Mobile Home Division of the Key Company (Twin Lakes), one of several defendants named in the motion for judgment. The evidence shows that the Coffeys signed a contract in December 1974 to purchase a "double-wide" mobile home (manufactured by Twin Lakes) from R & R Mobile Homes (R & R). The Coffeys completed arrangements to pay the $15,191.60 purchase price in April 1975, and R & R towed the home in two sections to the Coffeys' lot. As the home was being installed, Reginald P. Johnson, a partner in R & R, noticed that the frame had been "broken and rewelded", that it was "bow[ed]" in two places, and that "on the front side . . . it looked like it . . . had been dropped." As a result, he found it difficult to align and join the two sections and to level the combined unit on its foundation.

The Coffeys had inspected the separated sections on R & R's sales lot but had found nothing amiss except a defective door and paneling and "some little mouldings here and there that was loose." Shortly after the installation, the Coffeys complained to R & R about major defects they had discovered, and R & R conveyed their complaint to Twin Lakes. Twin Lakes engaged Marion Gleaton, a man with 27 years' experience in selling, transporting, installing, and repairing mobile homes, to examine the Coffeys' home. Gleaton visited the home in May 1975 and pre-

pared a list of 72 defects. The list included bulges, creases, and buckles in the interior and exterior walls. There were "gaps" between the walls and the ceilings. The floors were buckled and unlevel. The roof was not properly secured, and the ceiling showed evidence of leaks. Doors, windows, and cabinets were out of plumb, and some were inoperable. The plumbing leaked, and kitchen drain pipes sloped in the wrong direction.

Gleaton testified that the Coffeys' home was "[o]ne of the most deplorable degradations of a manufactured home . . . that I've ever seen in my life." He felt that an inspection of the two sections before they were joined would not necessarily have disclosed the defects he found. "Maybe the walls weren't buckled then . . . but whenever you put pressure on that home to level it up and if that home is not built square and things are not right for fitting together and you force it to make it fit then you're going to introduce a buckle, which yes, is the manufacturer's fault. . . ." He considered the home beyond repair "[b]ecause the way a mobile home is built you don't go in and repair them unless you tear them apart and start all over again. Now, you could patch it . . . but you end up with not a repaired item, a patched item." Asked what value he placed on the home, Gleaton replied that "if somebody had said, Gleaton, I'll give you this home if you'll move it out of here, I would have refused it. I put no value on it at all . . . ."

Mr. Coffey discussed Gleaton's list with a Twin Lakes' representative who told him to "go ahead and move in the home, that they would take care of the items." Meanwhile, the Coffeys had sold their former residence and "had to get out," so they moved into the Twin Lakes home in August 1975.

On several occasions, Twin Lakes sent workers to repair minor defects, some of which proved to be beyond repair, but the major defects remained. In February 1976, Mr. Coffey met with the treasurer of Twin Lakes' parent corporation, gave him a list of his complaints, and was assured that "he would take care of them." On August 10, 1976, the Coffeys filed their motion for judgment.

At trial, the Coffeys, who had continued to live in the home, introduced 32 photographs taken in March 1976. Mr. Coffey testified that the photographs showed the principal defects in the home as they existed when Gleaton conducted his inspection in May 1975 and that those defects had not been corrected.

Called as a witness by Twin Lakes, Jessie Hurt, county building official, testified that he went to the Coffeys' home in April 1976 to investigate seven alleged violations of standards promulgated by the State Fire Marshall's Office, State Corporation Commission. Hurt "found that the seven deficiencies had been corrected" and that the home satisfied all "safety" and "sanitary" standards. On cross-examination, Hurt explained that he was not "concerned with whether the frame is bent" or with other defects unrelated to such standards.

Twin Lakes also called Steve Usry, another expert witness, who had visited the Coffeys' home eight days before the trial. Accompanied by Coffey and using Gleaton's list as a guide, Usry inspected the defects and agreed that extensive repairs were necessary. However, he attributed some of the defects to faults in the foundation and others to improper installation. In Usry's opinion, the home could be repaired on its site for $3,200, and his opinion was endorsed by his service manager.

The trial court, sitting without a jury, found that Twin Lakes was liable to the plaintiffs for breach of implied warranty; that the date of acceptance by the purchasers was "when this suit was instituted August 10, 1976"; that, on that date, the value of the home as warranted was $15,191.60; that the measure of damages was the difference between that value and the value of the defective home on the date of acceptance, see Code § 8.2-714(2); and that the home was worthless on that date.

In the first of two assignments of error, Twin Lakes asserts that "the plaintiffs failed to establish . . . that the implied warranty of merchantability . . . was breached by the defendant" and that the trial court erred in overruling the motion to strike the plaintiffs' evidence.

■ Preliminarily, the defendant argues that "the implied warranty of merchantability [was] waived by the plaintiffs when they inspected the mobile home." We reject this argument. "[W]hen the buyer before entering into the contract has examined the goods . . . there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Code § 8.2-316(3)(b). The superficial defects the Coffeys observed when they examined the separated sections of the mobile home had only a marginal effect on the merchantability of the goods. The skewed frame and the resulting distortion in construction of the superstructure were the essence of the breach of war-

ranty. These defects in manufacture did not become apparent, even to experienced workmen, until pressure was applied to join the two sections and level the unit on its foundation. Such latent defects are not those contemplated by § 8.2-316(3)(b).

■ Addressing the gravamen of its first complaint, Twin Lakes maintains that the evidence was not sufficient to prove a breach of the implied warranty of merchantability. "Goods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used." Code § 8.2-314(2)(c). Alluding to this language, the defendant insists that "the home was obviously reasonably fit for the ordinary purpose for which it was intended . . . in that it was habitable." In support of that argument, Twin Lakes relies on the fact that the defects were not serious enough to prevent the Coffeys from living in the home, and upon the building official's testimony that the home complied with state safety and sanitary regulations.

The flaw in this argument is that it equates "merchantability" with "habitability." Certainly, the latter is an element of the former, but the fact that people may be able to live safely in a mobile home does not mean that it satisfies the warranty of merchantability. *See Jones* v. *Abriani,* 169 Ind. App. 556, 350 N.E.2d 635 (1976). While the repairs reported by the building official made the home safe and sanitary for purposes of human habitation, they did not render the home merchantable for purposes of the warranty. Indeed, Gleaton, Twin Lakes' own agent, testified that he would not have it as a gift. All the witnesses agreed that the defects were extensive and substantial. Not unexpectedly, the experts disagreed whether they could be satisfactorily repaired. But the trial judge resolved all conflicts in the testimony, and we hold that the evidence was sufficient to support his decision that Twin Lakes breached its implied warranty of merchantability.[1]

Under its second assignment of error, the defendant contends that the evidence was insufficient to prove damages with reasonable certainty.

---

[1] Pending this appeal, the General Assembly imposed an implied warranty upon sales of new dwellings. Code § 55-70.1. The statute defines the term "new dwelling" to mean "a dwelling or house not previously occupied." Only rental housing and condominium units are expressly excluded. For purposes of this opinion, it is unnecessary to decide whether this statute was intended to apply to sales of new mobile homes.

The trial judge ruled that, for purposes of value determinations, the date of acceptance was August 10, 1976, the day suit was filed, and since that ruling has not been challenged, it is the law of this case.[2] *Bostic* v. *Whited,* 198 Va. 237, 239, 93 S.E.2d 334, 335 (1956). In the defendant's view, "Mr. Gleaton's assessment [that the home was valueless] had no probative value . . . because it did not take into account" repairs made before and was too remote from the date of acceptance. It is true that the seven safety and sanitary deficiencies inspected by the building official had been remedied and that attempts had been made to repair certain surface defects. But Coffey testified at trial that the major defects listed by Gleaton and depicted in the photographs had never been corrected, and Usry had personally observed those defects only eight days before trial. It follows that if, as Gleaton testified, the home had no value when he inspected it, it had none on the date of acceptance.

Yet, Twin Lakes maintains that Gleaton's assessment was "contradict[ed]" by Coffey's testimony that the home was still being used as a residence on that date. In *Holz* v. *Motor Company,* 206 Va. 894, 147 S.E.2d 152 (1966), the buyer of an automobile brought a suit against the manufacturer claiming the amount of the purchase price as damages for breach of warranties. The plaintiff offered no independent evidence of the value of the defective car, and the trial court set aside a jury verdict for the plaintiff. In the course of our opinion affirming the judgment, we observed that "[p]laintiff's statement that the automobile was worthless to him does not establish the fact that it had no value. Obviously the automobile had some value, since it had been driven between 8,000 and 9,000 miles during a period of twelve months." *Id.* at 897-98, 147 S.E.2d at 155.

Reading that comment as a rule of law that a buyer of defective goods who has used them may not rest his claim for damages on evidence that they are worthless, the defendant urges us to apply the rule in this case. The defendant misreads the rationale of our decision. The buyer was denied recovery in *Holz,* not because he had derived some benefit from the use of the automobile, but because "there was no evidence to establish the value of the allegedly defective automobile" and hence, "[t]he jury's verdict award-

---

[2] Ordinarily, acceptance occurs when the buyer "does any act inconsistent with the seller's ownership." Code § 8.2-606(1)(c).

ing damages . . . was purely speculative." *Id*. at 897, 898, 147 S.E.2d at 155.

We decline to adopt the proposition the defendant urges as a *per se* rule of law, for we believe there are cases where a buyer's use of defective goods does not necessarily endow them with value for purposes of § 8.2-714(2).

In our view, this is such a case. The fair import of Gleaton's testimony was that the defects could be successfully repaired only by dismantling and rebuilding the entire home, that its value as salvage or as a merchantable commodity was less than the cost of disconnecting its two sections and transporting them from the Coffeys' lot, and hence, that the mobile home was unfit for the use intended. The Coffeys sold their former residence and, relying upon the defendant's assurances that the mobile home could be and would be repaired to serve its warranted use, moved into the home they had bought. The reason they used the defective goods was that they had no practical alternative.

Under these circumstances, the trial judge could have concluded that any benefit the Coffeys derived from use of the home was *de minimis* in light of the burdens that use entailed. Assessing the evidence as a whole, he found that the mobile home had no value on the date of acceptance. We hold that the evidence was sufficient to support these findings, and we will affirm the judgment.

*Affirmed.*

STEPHENSON, J., dissenting in part and concurring in part.

I concur with the majority in holding that the plaintiffs should recover a judgment as a result of Twin Lakes' breach of an implied warranty of merchantability, but I disagree with that portion of the opinion approving the trial court's finding that plaintiffs' mobile home had no value on the date of acceptance.

The evidence established that the plaintiffs have lived in the mobile home continuously since August, 1975. It has passed inspection by county building officials. While it is apparent that the home contains numerous and serious defects, I find the witness Gleaton's testimony that the home has no value to be utterly incredible.

Gleaton's testimony, when examined in context, is nothing more than an expression of the value of the mobile home *to him*. When

asked if he had determined the value of the mobile home, Gleaton responded:

> Well, being able to obtain other mobile homes at dealer cost if somebody had said, Gleaton, I'll give you this home if you'll move it out of here, I would have refused it. I put no value on it at all because it's too slipshod . . . .

Gleaton's opinion was not couched in terms of "fair market" value. He failed to employ any of the recognized methods for appraising property, such as comparable sales, the income approach, etc. Instead, he based his opinion on the value of the home to him, a mobile home dealer.

*Holz* v. *Motor Company,* 206 Va. 894, 147 S.E.2d 152 (1966), is strikingly similar to the present case. In *Holz,* the plaintiff testified that a defective automobile which he had driven between 8,000 and 9,000 miles was worthless *to him,* and we held that this statement did not support a finding that the automobile had no value. "Obviously the automobile had some value, since it had been driven between 8,000 and 9,000 miles during a period of twelve months." *Id.* at 897-98, 147 S.E.2d at 155.

A fact finder, whether court or jury, is not bound by the opinions of experts, and where, as here, the opinion is both incredible and based on the wrong legal standard, it should be rejected.

HARRISON and COCHRAN, JJ., join in dissenting and concurring opinion.