**VIRGINIA TRANSFORMER CORP., Plaintiff,**

v.

**P.D. GEORGE COMPANY, Defendant.**

**Civil Action No. 94–0935–R.**

United States District Court, W.D. Virginia, Roanoke Division.

June 14, 1996.

Matthew Patrick Warren Pritts, Michael J. Quinan, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, for plaintiff.

Kenneth John Ries, Johnson, Ayers & Matthews, Roanoke, VA, Joseph G. Nassif, John B. Kinsella, Thompson Coburn, St. Louis, MO, for defendant.

### *MEMORANDUM OPINION*

KISER, Chief Judge.

Before me is defendant's motion for summary judgment. The parties have fully briefed the issues involved and I have entertained oral argument. The motion is therefore ripe for disposition. For the reasons contained herein, I am of the opinion that defendant's motion should be granted in part and denied in part.

FACTUAL BACKGROUND:

This is a diversity product liability case. Plaintiff Virginia Transformer ("V–Trans") manufactures electrical transformers. During production the core and coil assembly of the transformers are together immersed in a varnish, through a process called "VPI." The VPI process originally used a solvent varnish, but in 1993 V–Trans sought a non-solvent varnish, largely because of environmental concerns. Its search led to defendant P.D. George ("George"), a manufacturer of industrial varnishes. George recommended its non-solvent VT70 varnish, allegedly representing that VT70 would be sufficient for V–Trans' purposes, and would not result in increased noise during the transformers' actual operation. The specification sheet sent by George to V–Trans included the following:

> [t]he recommendations, test results, and suggestions are offered herein as a guide in the use of these materials and are not a

guarantee to their performance inasmuch as the company has no control over the use to which others may put the product.

Def.Ex. A.

In January 1994 V–Trans purchased a sample lot of VT70 through George's distributor Essex Group, Inc. ("Essex"); the invoice issued by Essex to V–Trans contained the following:

> THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE GIVEN AND ACCEPTED IN LIEU OF (a) ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ARISING OUT OF THE CONDUCT OF THE PARTIES, AND (b) ANY OBLIGATION, LIABILITY, RIGHT CLAIM OR REMEDY FOR SELLERS NEGLIGENCE, ACTUAL OR IMPUTED. The remedies of the buyer for breach of any warranty arising hereby express or implied, or by operation of law, or for breach of any duty of Seller, expressed or implied, or arising out of any conduct of the parties shall be strictly limited to those provided herein to the exclusion of any and all other remedies ... [capitalization in the original].

Def.Ex. C, attachment.

The invoice issued by George for its VT70 sales to Essex contained the following:

> ... SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER MATTER WITH RESPECT TO THE GOODS ... [capitalization in the original].

Def.Ex. C., attachment.

V–Trans performed tests on the sample lot which revealed no defects. It did not then test for noise creation. VT70 was then purchased for general production use and V–Trans' VPI transformers were subsequently manufactured with VT70. By May 1994 V–Trans discovered that its VPI transformers created unacceptable levels of noise, particu-larly when operating at their normal running temperature. In July George was told about the noise; V–Trans stated that it suspected either VT70 or the steel laminate used to construct the transformer cores. George agreed to cooperate in the investigation. After conducting further tests, V–Trans concluded in August that VT70 was the culprit. Shortly thereafter, V–Trans eliminated the problem by altering the manufacturing process; it now varnishes coil and core separately. Through this allegedly more costly and labor-intensive process it continues to varnish with VT70.

In September George notified V–Trans that similar noise problems had been experienced by V–Trans' competitor, Neco–Hammond, and that Neco had concluded VT70 was at fault. V–Trans replied that it had already reached the same conclusion and had altered the VPI process. George corroborated the findings made by V–Trans and Neco by conducting its own tests. In December V–Trans made formal complaint to George about VT70's shortcomings. This action ensued.

V–Trans alleges that it suffered losses of $255,000.00, due to the repair of the noisy transformers, the investigation of the problem and the modification of the VPI system. It alleges that George agreed to compensate it for these losses, which George has denied.

Count I asserts the breach of an express warranty, through George's representations that VT70 was suitable for V–Trans uses. Count II, since dismissed by stipulation, asserted breach of the implied warranty of merchantability. Count III asserts breach of the implied warranty of fitness for particular purpose. Count IV asserts negligence through George's failure to adequately test and inspect VT70, and Count V asserts constructive fraud. Defendant now seeks summary judgment on all counts.

DISCUSSION:

I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Where the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## II. Counts I and III: Validity of Warranties

Defendant asserts that Counts I and III should be dismissed because (A) George did not guarantee, expressly or impliedly that VT70 was suitable for V–Trans' immediate use in the VPI process; (B) V–Trans conducted its own tests; and (C) V–Trans failed to timely notify George of its claim. Count III should further be dismissed because (D) George disclaimed any implied warranty.

### A. Express Warranty and Representations Made

■ George argues that no representation of VT70's suitability, either for the VPI process or for noiseless operation, were made. V–Trans counters that defendant cooperated with its customers in selecting the correct varnish and knew that VT70 would be used in the VPI process. George allegedly recommended VT70, specifically for the VPI process as it then existed. It allegedly further represented that VT70 would not result in an increase in noise and that it might rather lead to a decrease. This has all been attested by John DiCarlo, a George executive. *See* DiCarlo Dep.

Thus there exists a factual dispute on what George represented to V–Trans. Until this dispute is settled conclusively, it is impossible to determine the existence, if any, of express warranties made by George to V–Trans.

### B. Tests Conducted by Purchaser

Va.Code Ann. 8.2–316(3)(b) states:

when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which *an examination ought in the circumstances to have revealed* to him ... [emphasis added].

*Id. See also Johnson v. Hoffman,* 130 Va. 335, 107 S.E. 645, 647–48 (1921) (decided prior to adoption of UCC: buyer opted to inspect cattle himself and could not complain if his inspection was lacking).

George notes that V–Trans tested VT70 in January and decided to proceed with the purchase. Only later did it run the temperature test and still later concluded VT70 to be the source of noise. V–Trans attests that if it had detected a problem in the sample lot, it would not have proceeded with the order. Mukerji Dep. at 89, lns. 15–23.

■ In *Twin Lakes Mfg. Co. v. Coffey,* 222 Va. 467, 281 S.E.2d 864, 866–67 (1981) a trailer purchaser was excused for failure to find a latent defect. There, however, the buyer had not withheld purchase pending a sample test, as was done here. The fact of product testing would facially appear to hold plaintiff to its January test, it does not, however, because of the circumstances surrounding that test.

V–Trans states that it did not initially test for noise because George had already represented that VT70 would not increase noise. Mukerji Dep. V–Trans also avers that the noise test in May 1994 was not the only test needed after the noise problem was detected. Throughout the summer, V–Trans suspected both VT70 and component steel as possible culprits, testing both. Only in August was steel eliminated and it conclusively shown that VT70 was the cause.

Again, it is the unsettled facts surrounding George's representations on the quality of its product which prevent summary judgment. If V–Trans indeed tested the sample lot under the *circumstances* created by a represen-

tation that VT70 did not create noise problems, it cannot be held responsible pursuant to Va.Code Ann. § 8.2–316(3)(b) for a failure to test for noise.

### C. Reasonable Notice of Breach

■ George claims that V–Trans failed to give reasonable notice of its warranty claims, as required in Va.Code Ann. § 8.2–607(3)(a). *See also* Va.Code Ann. § 8.2–714 (requiring notice for recovery); *Standard Alliance Industries, Inc. v. Black Clawson Co.,* 587 F.2d 813, 823 (6th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979) (notice is element of claim, not affirmative defense). George adds that it has been prejudiced by this delayed filing. First, it states that it was denied the opportunity to cure; second, the defective transformers were repaired, thereby despoiling evidence, and third, the sales contracts had notice provisions: notice to George was required within 15–90 days of discovery and Essex required return of defective products within 60 days.

V–Trans counters that defendant received reasonable notice in July, when it was first told about the noise problem. George cooperated from that time in an attempt to find the source of the noise, which also weakens somewhat the claim that it could have "cured" had it been given notice.

■ To dispose of this issue, I need only note that a determination of what constitutes reasonable notice is a question of fact. *Cancun Adventure Tours, Inc. v. Underwater Designer Co.,* 862 F.2d 1044, 1047 (4th Cir. 1988).

### D. Disclaimer of Warranties

■ George states that during the original sale to Essex, it disclaimed all warranties. Essex also disclaimed with respect to V–Trans. Warranty disclaimers and limitations have been enforced against third-party beneficiaries, despite lack of privity. *Buettner v. R.W. Martin & Sons, Inc.,* 47 F.3d 116, 118–19 (4th Cir.1995); *Reibold v. Simon Aerials, Inc.* 859 F.Supp. 193, 199 (E.D.Va., Doumar, J., 1994). Thus it is asserted that the warranty chain was broken both at the original sale to Essex and at Essex' subsequent distribution to V–Trans. This position is cor-

rect with regard to implied warranties, but does not apply to any express warranties passing between George and V–Trans.

*Buettner*'s rule blocks any claim V–Trans would have, based upon either the implied warranties of fitness for particular purpose or for merchantability. Count III succumbs to this analysis. Any express warranties that might be claimed through Essex are similarly negated.

■ V–Trans correctly notes that because it is not a third-party beneficiary of warranty as discussed in *Buettner* and *Reibold,* the disclaimers are invalid with regard to George's express warranties to V–Trans. Neither *Buettner* nor *Reibold* involved representations made from the manufacturer directly to the consumer. Warranties created through specific and express representations between parties outside the chain of distribution must be disclaimed between those parties themselves, not through an intermediate distributor. Here, all relations and communications prior to sale passed directly between V–Trans and George; Essex was used merely as an inert conduit for the distribution of the product. V–Trans initially sought to purchase directly from George, but was directed to Essex instead. The purchase of VT70 for sampling and production use was the entire extent of V–Trans' relationship with Essex. Although the disclaimer in the invoice of George to Essex would negate any warranties arising from that transaction it would not negate any express warranty of either fitness or merchantability made directly by George to V–Trans. George's alleged express warranties were made (if indeed made) directly to V–Trans, and the use of Essex as a mere neutral intermediary is no bar. *Coastal Leasing Corp. v. O'Neal,* 103 N.C.App. 230, 405 S.E.2d 208, 212–13 (1991). Count I, based on an express warranty, therefore survives.

While *Buettner* and *Reibold* both note the well-established exception of unconscionability in the recognition of disclaimers, this was a commercial transaction between equally positioned parties. I do not believe that an unconscionability analysis would apply.

## III. Economic Loss Rule and Tort–Based Claims

### A. "Component Parts" versus "Other Property"

George argues that Counts IV and V should be dismissed because they sound in tort and are barred by the economic loss rule. Without this rule, every breach of contract case would be transformed into tort. *Kamlar Corp. v. Haley*, 224 Va. 699, 299 S.E.2d 514, 517 (1983); *City of Richmond v. Madison Management Group, Inc.*, 918 F.2d 438, 446 (4th Cir.1990). Economic loss is "disappointed economic expectations." *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55, 57 (1988); *see also id.* n. 3 (citing *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 752, 435 N.E.2d 443, 449 (1982) (economic loss is "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits [no claim of personal or property injury] as well as diminution in value [due to inferior quality or failure to work as expected]")). When such economic loss is claimed, the concern is the failure to meet a standard of quality agreed upon by the parties. *Sensenbrenner*, 374 S.E.2d at 57; *Blake Construction Co. v. Alley*, 233 Va. 31, 353 S.E.2d 724 (1987) (quoting *Crowder v. Vandendeale*, 564 S.W.2d 879, 882 (Mo.1978), *overruled on other grounds, Sharp Bros. Contracting Co. v. American Hoist & Derrick Co.*, 703 S.W.2d 901 (Mo.1986).

*Crowder v. Vandendeale*, 564 S.W.2d 879, 882 (Mo.1978) stands for the proposition, as yet unstated explicitly in Virginia, that the economic loss rule applies to cases of defective products where the only injury is to the product itself.

Plaintiff emphasizes that it seeks to recover loss to the transformers it manufactured, not VT70. Such loss on the transformers qualifies as loss on "other property" per *Sensenbrenner*'s definition. *See also Redman v. Sentry Group, Inc.*, 907 F.Supp. 180, 185 (W.D.Va., Williams, J., 1995) (coins stolen from defective safe; plaintiff may recover from safe manufacturer for loss of coins).

I am unconvinced by a characterization of the transformers as "other property." While it is true that varnish and transformers fundamentally differ, the varnish is an integral component part of the completed transformer, just as the swimming pool was a component part of the completed house in *Sensenbrenner*. Component parts are not "other property." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 867, 106 S.Ct. 2295, 2300, 90 L.Ed.2d 865 (1986) (defective turbine parts are but a part of an integrated product, the turbine itself). *See also East Mississippi Elec. Power Ass'n v. Porcelain Products Co. (Inc.)*, 729 F.Supp. 512, 518 (S.D.Miss.1990) (defective porcelain insulator in electrical transformer; damage to entire system not damage to "other property," and was solvable by removal of insulator). I therefore conclude that the economic loss rule bars the negligence claim asserted in Count IV.

### B. Constructive Fraud

George points out that in *Ward v. Ernst & Young*, 246 Va. 317, 435 S.E.2d 628, 632 n. 2 (1993), the possibility was left open for economic loss recovery for "fraud." This is rightly characterized as actual fraud, which differs decisively from constructive fraud.

Conveniently omitting either modifier, V–Trans asserts that the economic loss rule does not apply in a "fraud claim." When the duty to be truthful is imposed by law the rule does not apply. *Richmond v. Madison Management*, 918 F.2d 438, 446 (4th Cir.1990); *Sensenbrenner*, 374 S.E.2d at 58; *Rotunda Condo. Unit Owners' Assoc. v. Patcraft Mills*, 33 Va.Cir. 230 (Fairfax Co.1994) (applied specifically to fraud); *Tidewater Beverage Services, Inc., v. Coca Cola Co., Inc.*, 907 F.Supp. 943, 948 (E.D.Va.1995) (rule does not bar fraud claim because claim based on duty not to commit fraud). George correctly notes that these cases are actual fraud cases.

George further notes that in *Coleman Cable Systems Inc. v. Shell Oil Co.*, 847 F.Supp. 93, 96 (N.D.Ill.1994), a claim for negligent representation was dismissed pursuant to the rationale in *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). *Moorman Mfg.* was itself cited

approvingly in *Sensenbrenner v. Rust,* 374 S.E.2d 55, 57, in which Virginia subscribed to the economic loss rule. Thus George argues that Virginia would likely follow the *Moorman Mfg.* analysis regarding constructive fraud.

█ *Moorman Mfg.* is correct. Constructive fraud is effectively nothing more than a claim of negligence. Carried to its logical conclusion it would emasculate the economic loss rule. Constructive fraud implies no greater duty for a defendant to be accurate in its representations than does a negligence standard. Thus the fraud exception to the economic loss rule is solely for actual fraud, a distinction correctly made in the decisions cited *supra,* and one adhered to here.

CONCLUSION:

The negligence claims of Counts IV and V properly fall victim to the economic loss rule and is appropriately disposed of on summary judgment. Count III was effectively disclaimed. Count I survives, primarily through the indeterminate state of facts surrounding George's representations to V–Trans about the qualities of VT70.