**BANK OF AMERICA, Plaintiff,**

v.

**Gary MUSSELMAN, Bowling, Franklin & Co., LLP, Defendants.**

**No. CIV.A.02–253–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 13, 2003.

548

S. Ricardo Narvaiz, Fairfax, VA, for Plaintiff.

Michael Joseph McManus, Brian Arthur Coleman, Drinker, Biddle & Reath L.L.P., Dennis John Quinn, Carr Maloney P.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This diversity action grows out of a debtor's default on an eleven million dollar bank loan. Among the bank's various claims in this action is a third-party beneficiary contract claim against the debtor's accounting firm for professional malpractice. At issue on summary judgment is whether the record evidence presents a triable issue of fact concerning whether the bank was an intended third-party beneficiary of the debtor's contract with the accounting firm for accounting services.

## I.

In November 1997, plaintiff, Bank of America (the "Bank"),[1] a North Carolina company, approved a loan to Educational Credit Services, Inc. ("ECS"), a Virginia corporation that was then in the business of collecting delinquent student loan accounts on behalf of a variety of institutional clients, including the U.S. Department of Education, and the education departments of the States of Texas and New York.[2] The loan was to be funded via a line of credit, the limit of which was increased over time. The initial loan amount was $1,761,068. In 1998, the Bank made three separate increases in ECS's line of credit: to $3,000,000 in February 1998, to $5,000,000 in June 1998, and then to $6,000,000 in September 1998. In February 1999, the Bank again increased ECS's line of credit to $9,000,000. In September 1999, the revolving line of credit was first extended to $10,000,000, and sometime thereafter to $11,000,000. In total, between November 1997 and February 2000, ECS drew down in excess of $11,000,000 from its line of credit, and the unpaid balance as of March 1, 2000 is approximately $11,660,512.44, the amount the Bank seek here in damages.

Beginning in 1993, and continuing through 1999, ECS retained Bowling, Franklin, & Co., L.L.P. (the "Bowling firm"), a Virginia limited partnership, to provide ECS with accounting and auditing services. For each of these years, ECS entered into a separate retainer agreement with the Bowling firm for the latter to provide ECS with accounting and auditing services for the previous calendar year. For example, pursuant to the 1997 retainer

---

**1.** NationsBank was Bank of America's predecessor, and approved the loan to Educational Credit Services in 1997. For purposes of clarity, NationsBank and Bank of America are referred to collectively as the "Bank."

**2.** The remaining individual defendant is an ECS officer. Gary Musselman was the President of ECS.

agreement, the Bowling firm, in the Spring of 1997, audited ECS's calendar 1996 financial statement and issued its audit report on May 29, 1997.

None of the ECS–Bowling firm retainer agreements refers in any way to the Bank's loan to ECS. Nor did ECS officers ever discuss the Bank loan requirements with the Bowling firm's accountants.[3] Indeed, when asked to specify all the uses of the audited financial statements about which ECS informed the Bowling firm, Gary Musselman merely stated: "[the] Bowling [firm]...was informed that ECS required a certified audit in order to conduct operations[, and of]...the public consumption of the audits by clients, potential clients, lending institutions, and potential investors." Yet, because ECS submitted copies of the loan documents to the Bowling firm for the November 1997 extension of credit, the Bowling firm first became aware of the loan during the course of its 1998 audit of ECS's calendar 1997 financial statements. And thereafter, it appears that ECS submitted the Bank loan documents to the Bowling firm on at least two additional occasions, namely the credit extensions that occurred in September 1998 and February 1999.

A recurring term in the loan documents is the requirement that ECS provide "a consolidated balance sheet and income statement, prepared in accordance with generally accepted accounting principles ["GAAP"] on an audited basis by an independent certified public accountant acceptable to the Bank...." Additionally, in loan documents for each credit extension, ECS warranted that its financial statements were prepared in accordance with GAAP, and that they "fairly present [ECS's] financial condition."

Significantly, the February 1999 loan documents contained an additional "condition precedent to first advance" that had not been included in the previous loan documents. This condition required an

> evaluation of accounts receivable and calculation of WIP report and [the issuance of an] opinion that WIP is acceptable and in accordance with GAAP from Deloitte [&] Touche engagement satisfactory to the Bank.

On February 19, 1999, the Bank attempted to engage Deloitte & Touche to conduct this evaluation, but according to Nathan Ward, a Bank manager, this never occurred. Nonetheless, for reasons not disclosed in the record, the Bank, on February 24, 1999, extended ECS's line of credit to $9,000,000 despite the absence of the Deloitte & Touche evaluation.

The crux of the Bank's case against the Bowling firm is the firm's approval of ECS' use of a methodology for calculating ECS's anticipated revenue that produced allegedly inaccurate and inflated figures. This methodology, known as "Work in Progress" ("WIP"), involved projecting ECS's future revenues by extrapolating from the payment histories of tens of thousands of debtors who ultimately paid their delinquent accounts accumulated over the previous four years. According to the Bowling firm, the WIP methodology is often used by companies that incur costs long before they collect the matching revenues. ECS was such a company; it incurred most of its costs up front. When

3. Indeed, Gary Musselman has stated that he never had a conversation with anyone at the Bowling firm regarding the Bank's requirement of audited financial statements; he believed the requirement was "pretty standard," and it did not "jump...out" as anything unusual to discuss with the Bowling firm. Gary Musselman has also stated that he never told anyone at the Bowling firm that he would provide Bank with the audited financial statements prepared by the firm. Moreover, Elaine Farmer, the Bowling firm partner in charge of the ECS account, has testified that no Bowling firm employee ever had any substantive conversation with a Bank employee regarding ECS matters, including the loan.

ECS received a contract, it located the delinquent debtors by using automatic dialers and "skip tracing" technology; these dialers could make in excess of 20,000 calls per day. According to the Bowling firm, over 60% of ECS's costs occurred in this phase of the collection process. Once a debtor was located, ECS would negotiate a payment plan with the debtor. When the debtor made a first payment, ECS earned its commission on that loan payment. Further, ECS determined that once this first payment was made, the historical record confirmed that the debtor generally proceeded to pay off the entire amount of the debt on schedule. Thus, once the first payment was received, ECS considered that account to be a "work-in-progress," or WIP, and reflected it as such on its financial statements. The WIP methodology was supposed to represent future cash flow expected from debtors that had been located, had agreed to a payment plan, and had made an initial payment under the plan.

ECS developed a formula to reflect its WIP or expected commissions on the company's financial statements. According to the Bowling firm, the formula began with the total amount of student loans in repayment status, and estimated the total potential commissions to be collected from these repaid loans. ECS then subtracted its expected collection costs, and then further discounted that number by 9%. This resulting figure was the WIP receivable listed on the ECS financial statements. In essence, the WIP methodology involved relying on historical loan collection data to justify accruing revenues or commissions not yet earned or received.

ECS, with the Bowling firm's approval, labeled WIP as "accounts receivable," a characterization that the Bank contend painted an inaccurately optimistic picture of ECS's financial condition. And indeed, despite large WIP figures, ECS was ultimately forced to close its doors in October 2000. But this event was far from sudden. ECS's financial difficulties began in April 1998. In September 1999, the Bank transferred ECS's loan to its "Special Assets Division," the division responsible for handling accounts with specific issues requiring closer attention. Also, in 1999, ECS informed the Bank that the WIP projection totaled $9,544,547, while ECS's actual accounts receivable were then only $1,616,260. Yet, ECS and the Bowling firm continued to use the WIP methodology through April and May 2000, at which time WIP projections indicated that ECS's accounts receivable were nearly $27,000,000, when, the Bank alleges, ECS's actual accounts receivable were less than $2,700,000. Indeed, the Bank alleges that ECS was actually insolvent during the 1998–2000 time period. In this regard, the Bank has presented an expert report by James Wallace, a certified public accountant, attesting to the reasons why the Bowling firm's inclusion of WIP as "revenue" was not in accordance with generally accepted accounting practices.

Not only was the Bank was aware that ECS used WIP to approximate account receivables, but it was also aware of exactly how WIP was calculated.[4] The Bank also conducted at least four of its own field examinations of ECS, the first of which occurred in June 1998. The purpose of

---

4. For example, the Bank's March 23, 1998 Base Memorandum, which analyzed ECS's management, market share, operations, and assets, included in a discussion of "accounting issues," which centered on ECS's use of WIP:

Use work in [progress] accounting for the Accounts Receivables. This means that when the first payment is made on a loan the entire fee can be counted as a receivable. However the entire amount is not recorded as a receivable[. I]t is discounted for the historical default rate and the histor-

these field examinations was to "conduct an audit of the books and records and to evaluate the quality of the collateral that supports the [B]ank's working capital line of credit." According to Nancy Jennings, a Bank senior vice president, the field examiners "provide some tests on the actual collateral of the inventory and accounts receivable in order to determine the advance rates that [the Bank] use[s] in the borrowing base." While the field examiners had experience in conducting these types of audits, they were not certified public accountants. During the June 1998 field examination, the examiners noted that one of the "primary, critical issues" regarding its loan to ECS was the WIP receivables. After recounting the WIP methodology,[5] the field examination report warned:

> The potential for the WIP's receivables as well as the revenues to be overstated comes if there is an increase in the default rate and/or collection costs or a decrease in the number of loans. Also, there is no time limit on when these WIP's receivables will be collected if they are collected. A lower advance rate and additional monitoring are recommend[ed] on these WIP's receivables.

Subsequent in-house field examinations occurred on April 1999, January 2000, and April 2000, and each of these audit reports contains a detailed analysis of ECS's use of WIP to approximate account receivables.

In December 2000, the Bowling firm notified ECS that it no longer considered WIP to be consistent with generally accepted accounting principles, or an accurate method of accounting for ECS's expected future revenues. According to the Bowling firm, the impetus for its change of opinion was the firm's discovery of the ECS trust account transfers to its operating accounts.[6] Additionally, by November 2000, ECS was closed, and many of its employees had left the firm. As a result, ECS was not able to continue to collect the loans already in its system, thereby rendering the WIP methodology an inaccurate predictor of future revenue for ECS. For these reasons, the Bowling firm included an adverse opinion of WIP in its 2000 audit report.

On February 21, 2002, the plaintiffs, which then included the Receiver for ECS, filed a seven count complaint.[7] On October 7, 2002, plaintiffs' negligence and breach of fiduciary claims (Counts I–IV)

---

ical cost to collect a single loan. These discounts actually will under value the account receivable based on historical averages. The company is audited annually and then 4 audits are required for government compliance for each product line and then again from Texas, New York, and Oklahoma.

5. The field examination report described the methodology as follows:

Included in the financial statements are net revenues that are net of estimated defaults and estimated collection costs, discounted at 9%. WIP's receivables represent the recordation of this revenue. ECS recognizes collection service revenue pertaining to student loans when a delinquent debtor is contacted, a repayment schedule is determined and a payment is received. Currently, ECS

is using historical data in determining the estimated defaults and collection costs.

6. The Bank's discovery of these trust account transfers was also the impetus for the Bank's prompt request for the appointment of a special receiver for ECS. *See Bank of America, N.A. v. ECS Entities*, Chancery No. CH00–316, Va. Cir. Ct. for Fredericksburg City, Va. (October 20, 2000). The Receiver, initially a co-plaintiff with the Bank, was dismissed by consent, on the ground that it did not have any authority to file lawsuits on behalf of creditors. *See* Va.Code §§ 8.01–591–8.01–599; *Bank of America v. Musselman*, No. 02–253–A (E.D.Va. January 3, 2003) (Order).

7. The seven counts in the initial complaint were as follows:

Count I, by the Bank, and Count II, by the Receiver, alleged that ECS directors and offi-

against defendant Robert Hacker were dismissed on the ground that he owed no fiduciary duty or duty of care to the Bank in the absence of self-dealing. *See Bank of America v. Musselman,* 222 F.Supp.2d 792 (E.D.Va.2002). On October 15, 2002, the plaintiffs' filed their second amended complaint. Following further briefing and argument, the amended claims against Hacker and Richard Baum were dismissed for the reasons stated in the earlier opinion, while the claims against James Miller, and David Wanders were dismissed with the plaintiffs' concurrence. *See Id.,* No. 02–253–A (E.D.Va. November 21, 2002) (Order). Left standing after a further amendment of the complaint and dismissals of various other claims were the breach of fiduciary duty claims against Gary and Catherine Musselman, and the accountant malpractice claim against the Bowling firm.[8] This opinion focuses only on Count VIII, which alleges accountant malpractice and negligence by the Bowling firm for its failure to perform a diligent inquiry prior to its approval of ECS' use of WIP in the ECS financial statements.

On December 4, 2002, the Bowling firm filed its summary judgment motion, pursuant to Rule 56, Fed.R.Civ.P., arguing that the Bank's claim fails because the Bank lacks privity of contract with the Bowling firm, and is not a third-party beneficiary of the contract between ECS and the Bowling firm.

---

cers negligently misrepresented WIP to the Bank and its other creditors as an accurate measure of ECS's accounts receivable, thereby inducing the Bank to extend the line of credit to ECS. Counts I and II also alleged that the ECS officers were negligent in both making the client trust fund transfers, and failing to disclose them to plaintiffs.

Count III, by the Bank, and Count IV, by the Receiver, alleged that ECS directors and officers' breached their fiduciary duties to the Bank and its other creditors by misrepresenting WIP as an accurate measure of ECS' accounts receivable, making the unauthorized trust fund transfers, and then failing to disclose them to plaintiffs.

Count V, by the Bank, alleged that ECS directors and officers committed a tort to property, impairing the value of the Bank's collateral (the value of ECS as a "going concern").

Count VI, by the Receiver, and Count VII, by the Bank, alleged that Bowling, Franklin and Co., the accounting firm defendant, negligently approved ECS's use of WIP to assess ECS's financial condition, thereby violating its duty to ECS's creditors, including the Bank.

8. The other counts contained in the Third Amended Complaint against the individual defendants, Gary Musselman and Catherine Musselman, are as follows:

Count I (by the Bank) alleges breach of fiduciary duty, based on the Musselmans' failure to disclose the unauthorized trust account transfers to the Bank;

Count II (by the Bank) alleges constructive fraud, based on the Musselmans' failure to disclose the unauthorized trust account transfers to the Bank;

Count III (by the Bank) alleges tort to property, based on the diminution of value of the Bank's security interest in ECS, due to the Musselmans' failure to disclose the unauthorized trust account transfers to the Bank;

Count IV (by the Bank) alleges breach of fiduciary duty, based on the misuse of the U.S. Department of Education account receivable, in which the Bank had a senior security interest;

Count V (by the Bank) alleges tort to property, based on the misuse of the Department of Education account receivable, in which the Bank had a security interest;

Count VI (by the Bank) alleges constructive fraud, based on the misuse of the Department of Education account receivable, in which the Bank had a security interest.

On December 16, 2002, plaintiffs withdrew their tort to property claim, contained in Counts III and V. On January 3, 2002, the constructive fraud claims contained in Counts II and VI were dismissed; Catherine Musselman was also dismissed from the case. *See Bank of America v. Musselman,* No. 02–253–A (E.D.Va. January 3, 2003) (Order).

## II.

The principles governing summary judgment are well-established, and are the lens through which the record must be viewed. In essence, summary judgment is appropriate only when there is no issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. Put differently, the movant is entitled to judgment as a matter of law where, "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Importantly, inferences drawn from the facts must be viewed in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Yet it is also true that the non-moving party, "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue [of material fact]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, to survive a motion for summary judgment, the non-moving party must come forward with evidence sufficient to establish the existence of every element essential to its case on which it bears the burden of proof at trial, even if the moving party presents no evidence. *Celotex*, 477 U.S. at 321–24, 106 S.Ct. 2548. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. A "mere scintilla" of evidence is not enough to defeat summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III.

Analysis of the Bank's accounting malpractice claim against the Bowling firm properly begins with the question whether there is any legal basis for such a claim given that there was no contract between the Bank and the Bowling firm. In Virginia, the principles governing disposition of this question are well-settled. First, privity of contract is required where, as here, a non-party to a contract for the provision of accounting services seeks damages for an economic loss resulting from the accountant's allegedly negligent performance of contractual duties.[9] *See Ward v. Ernst & Young*, 246 Va. 317, 435

---

**9.** Economic losses include "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits, with no claim of personal or property injury, as well as diminution in value due to inferior quality or failure to work as expected." *Virginia Transformer Corp. v. P.D. George Co.*, 932 F.Supp. 156, 162 (W.D.Va. 1996). For example, the Virginia Supreme Court has characterized as an economic loss a shareholder's claim that the accounting firm hired by his corporation engaged in professional negligence resulting in a diminution of the corporation's stock value. *Ward*, 435 S.E.2d at 633. The court explained that the plaintiff was suing for his disappointed economic expectations resulting from defendant's "substandard" accounting services.

Thus, while the privity requirement is waived when the plaintiff is alleging non-economic losses, such as physical injury to person or property, that exception does not apply here, nor in *Ward*, where the plaintiff is essentially attempting to recoup the loss from a bad loan or investment. *See Id.; Sensenbrenner v. Rust, Orling, and Neale, Architects*, 236 Va. 419, 374 S.E.2d 55, 57 (1988). The crux of the Bank's claim is that the economic performance of ECS did not meet its expectations: ECS was a greater credit risk than the Bank previously estimated, and the WIP methodology proved to be an inaccurate predictor of ECS's future revenues and profitability. Accordingly, these injuries cannot be characterized as injury to property. *See also First National Bank of Boston v. Une*, 1988 WL 130050 (N.D.Ill.1988) (holding that plaintiff bank who sues defendant officer for negligently inflating his corporation's earnings is barred by the economic loss doctrine because

S.E.2d 628, 631 (1993). In such circumstances, however, the privity requirement may be satisfied through a showing by the non-party that he is a third-party beneficiary of the contract. *See Id.* at 634; *Copenhaver v. Rogers*, 238 Va. 361, 384 S.E.2d 593, 596 (1989). In this respect, a putative third-party beneficiary must demonstrate that the contracting parties "clearly and definitely intended [the contract] to confer a benefit upon him." *Ward*, 435 S.E.2d at 634; *Copenhaver*, 384 S.E.2d at 596. While the third party need not be named in the contract, he must otherwise demonstrate that he was a "direct," not merely "incidental," beneficiary to the contract. *See Kelley v. Griffin*, 252 Va. 26, 471 S.E.2d 475, 477 (1996); *Copenhaver*, 384 S.E.2d at 596. As the Virginia Supreme Court stated, "the essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain." *Id.* In the case at bar, a non-party to a contract for accounting services who suffers an economic loss as a result of reliance on the product of such services may sue the responsible accountant only where the injured non-party is an intended third-party beneficiary of the accounting services contract. *See Ward*, 435 S.E.2d at 631.[10] Thus, the question presented here is whether the summary judgment record discloses a triable issue of fact as to the Bank's status as a third-party beneficiary. More specifically, the question is whether there is a jury issue as to whether the Bank can show on the existing record that

ECS's "overriding intent" in entering into the accounting services contract with the Bowling firm was to confer a benefit on the Bank, and that ECS's purported intention was conveyed to, and accepted by, the firm. *See Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 229–30 (4th Cir.2000); *Copenhaver*, 384 S.E.2d at 596.

### IV.

■ These well-settled principles of Virginia law, applied here, point persuasively to the conclusion that there is no triable issue of fact as to the Bank's status as an intended third-party beneficiary of the ECS–Bowling firm contract. Although there is no factually identical authority, this issue is nonetheless controlled by a number of cases, each emphasizing the centrality of the contracting parties' intent. A review of these cases compels the result reached here: the Bank has not produced sufficient evidence that would allow a jury to find that the Bank was a third-party beneficiary.

Particularly instructive is the Supreme Court of Virginia's decision in *Ward v. Ernst & Young*, where a shareholder sued his corporation's accounting firm for professional negligence based on his putative third-party beneficiary status. The plaintiff, the sole shareholder of the corporation, had sold a portion of his stock to another investor. This sale was subject to a successful audit by a "Big Eight" accounting firm, and the corporation retained Ernst & Young for that purpose. Subsequently, the shareholder reacquired

plaintiff is "attempting to find relief from a transaction, which, although appearing beneficial in the beginning, was, in hindsight, a bad bargain.").

**10.** In *Ward*, the Virginia Supreme Court had explicitly declined to carve out an "accountant exception" to the privity of contract requirement in economic loss cases. *Id.* at 631.

In so holding, the court rejected the shareholder's argument that accountants, by virtue of their certification, "are vouching for the reliability and accuracy of their work; that they are inviting the public to rely on...their work; and that it is foreseeable that third parties will rely on the accountants' work." *Id.* at 632.

his shares from the investor, and contracted to sell all his shares to another corporation; in that agreement, the shareholder warranted that his corporation's financial statements, prepared and reviewed by Ernst & Young, were accurate. Later, the buyer corporation discovered that the financial statements overstated the corporation's assets and understated its liabilities. The shareholder paid the buyer $500,000 as a result of the errors, and in turn sued Ernst & Young, arguing that he was an intended third-party beneficiary of the contract between his corporation and Ernst & Young. On these facts, Supreme Court of Virginia concluded that a reasonable jury could have found that the sole shareholder was a third-party beneficiary of the contract between the accounting firm and the shareholder's corporation. *See Ward*, 246 Va. 317, 435 S.E.2d 628. The court found persuasive the following facts, none of which is present in the instant case: (1) the only reason for hiring the accounting firm was to provide auditing services to facilitate the two stock sales; and (2) the only beneficiary of the successful stock sales was the sole shareholder. *See Id.* at 635. Thus, the only beneficiary of the accounting services contract in *Ward* was the sole shareholder.[11] The contrast with this case is readily apparent: The Bank's loan was not the reason for ECS's retention of the Bowling firm, and the Bank was not the only beneficiary of the Bowling firm's accounting services. At best, the Bank was an incidental beneficiary of these services.

Also instructive is *Copenhaver v. Rogers*, where plaintiffs sued their grandmother's attorney for negligently preparing her will, thereby depriving them of their remainder interest in their grandmother's estate. The plaintiffs claimed they were intended third-party beneficiaries of their grandmother's contract with her attorney, conceding that they otherwise lacked privity of contract with him. *See Copenhaver*, 384 S.E.2d at 595. The Supreme Court of Virginia rejected this claim, holding that the plaintiffs' grandmother did not enter into the contract with her attorney with the "intent of conferring a direct benefit" upon the plaintiffs. *Id.* at 596. It was irrelevant that the plaintiffs were the beneficiaries of the will.[12] *See Id.*, at 596–97. Significantly, the court provided a hypothetical that illustrated what would constitute a third-party beneficiary contract. In this hypothetical, a client directed her attorney to prepare her will, telling him that her "one overriding intent" was to ensure that her grandchildren received one million dollars, and if the attorney did not agree, the client would not hire him. The court went on to explain that if the attorney agreed to the client's directive, and then failed to comply, the grandchildren could sue the attorney as intended third-party beneficiaries of the contract between the attorney and client. *See Id.* Again, the contrast between this hypothetical and the case at bar is obvious: ECS never advised the Bowling firm that its "one overriding intent" in retaining the Bowling firm was to benefit the Bank and obviously, the Bowling firm did not accept the retention with this understanding.

Similarly compelling and controlling is the Fourth Circuit's decision in *Food Lion*,

---

11. The *Ward* court distinguished that case, which involved a stock sale where the clear, primary beneficiary was be the shareholder, from a case involving an asset sale, in which the shareholders would not be the sole beneficiaries. *See Ward*, 435 S.E.2d at 636.

12. Likewise, in the instant case, while the Bank may have chosen to make some use of the product of the Bowling firm's accounting services, it was *not* an intended beneficiary of the contract between the Bowling firm and the Bank. Like the *Copenhaver* plaintiffs, the Bank was merely the incidental beneficiary of contract at issue.

*Inc. v. S.L. Nusbaum Ins. Agency, Inc.,* which relied on the *Copenhaver* hypothetical to reject the plaintiff's contention that it was a third-party beneficiary. *See Food Lion,* 202 F.3d at 229–30. There, the plaintiff's contract with a construction contractor required the latter to obtain performance bonds as a condition of the contract. The contractor hired a broker to obtain the bonds; the broker then entered into a contract with an insurance company that issued the required bonds. Ultimately, the contractor filed for bankruptcy and the insurance company failed to satisfy its obligation under the bonds. Plaintiff then sued the broker, arguing that it was the intended third-party beneficiary to the contract between the contractor and the broker. The Fourth Circuit, however, ruled that the plaintiff was not an intended third-party beneficiary even though it certainly benefitted from the contract between the contractor and the broker. The court held that the intention of the contracting parties was (1) to confer a benefit on the contractor, who was able to satisfy a condition precedent to complete the deal with the plaintiff, and (2) to confer a benefit on the broker, who was compensated for obtaining the performance bonds. *See Id.* Drawing on the *Copenhaver* hypothetical, the Fourth Circuit explained that the *Food Lion* plaintiff there would have been a third-party beneficiary only if the contractor had told the broker that the contractor's one "overriding intent [in making

the contract with the broker] was to make sure [the plaintiff] was fully compensated if [the contractor] defaulted." *Id.* Similarly, in the instant case, it is clear that the "overriding intention" of the parties to the ECS–Bowling firm contract was not to confer a benefit on the Bank, but rather (1) to confer a benefit on the Bowling firm in the form of financial compensation, and (2) to confer a benefit on ECS, in the form of audited financial statements needed generally to conduct its operations.

The Bank's argument for third-party beneficiary status fails because it rests entirely on the Bowling firm's presumed knowledge of the loan audit requirement in the loan documents. Such knowledge by itself, does not warrant a jury finding of third-party beneficiary status.[13] As *Ward, Copenhaver,* and *Food Lion* confirm, more is required; there must be (1) evidence that ECS advised the Bowling firm that ECS's overriding intent in retaining the Bowling firm's services was to provide the Bank with audit information for the loan, and (2) evidence that the Bowling firm knew of ECS's intent in this regard and agreed to it. The record is devoid of any such evidence: indeed the undisputed record is to the contrary. ECS never expressed any such intent to the Bowling firm, and the Bowling firm was never advised that it was the designated CPA "acceptable to the Bank" under the loan documents to provide audits of ECS, or that the Bank was relying on the firm's audits of ECS's finances.[14] In these circum-

---

**13.** To hold otherwise would effectively convert creditor banks into third-party beneficiaries of accounting services contracts merely because accounting firms routinely receive or view loan documents in the course of auditing debtor clients. Such a result would essentially erase the boundaries of the third-party beneficiary doctrine as drawn by *Ward, Copenhaver,* and *Food Lion.*

**14.** Additionally, evidence negating the contracting parties' intent to confer a benefit on

the Bank is found in the loan documents themselves. A provision in the February 1999 loan documents required a Deloitte & Touche evaluation of WIP under GAAP as a condition of the extension of credit to $9,000,000. The Bank cannot plausibly contend that the Bowling firm intended to confer a benefit on the Bank when, from the Bowling firm's perspective, ECS and the Bank intended that Deloitte & Touche provide the same accounting services that are the basis of the Bank's instant claim against the Bank.

stances, it is not plausible to conclude that the Bowling firm, in contracting with ECS, intended to confer any benefit on the Bank.

In sum, this record shows only that the Bowling firm knew of the loan, and arguably of the loan audit requirement only as a result of ECS's routine submission of the loan documents and other ECS financial documents to provide the Bowling firm with a complete picture of ECS's financial status. As *Ward, Copenhaver,* and *Food Lion* make clear, this does not amount to an adequate basis for a finding of third-party beneficiary status. In general, a creditor bank cannot claim to be the third-party beneficiary of an accounting services contract between an accounting firm and its client where, as here, the accounting firm's knowledge of the bank loan audit requirement derives solely from the client's routine submission of loan documents and other financial documents to the accounting firm to provide the firm with a complete picture of the client's financial status.

In the end, the Bank, like the plaintiffs in *Copenhaver* and *Food Lion,* is at best an incidental beneficiary of the contract at issue. Accordingly, the Bank's claim for third-party beneficiary status must fail, and the Bowling firm's motion for summary judgment on this basis must be granted.

An appropriate Order has issued. The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.