**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1654**

HANWHA AZDEL, INC., f/k/a Azdel, Inc.,

        Plaintiff – Appellant,

    v.

C&D ZODIAC, INC.,

        Defendant – Appellee,

    and

NEENAH TECHNICAL MATERIALS, INC.,

        Movant – Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg. Norman K. Moon, Senior District Judge. (6:12-cv-00023-NKM-RSB)

Argued: March 26, 2015        Decided: June 9, 2015

Before GREGORY, KEENAN, and WYNN, Circuit Judges.

Affirmed in part, vacated in part, reversed in part, and remanded by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Gregory and Judge Keenan joined.

**ARGUED:** Frank Kenneth Friedman, WOODS ROGERS, PLC, Roanoke, Virginia, for Appellant. Bevin Ray Alexander, Jr., FREEMAN, DUNN, ALEXANDER, GAY, LUCY & COATES, PC, Lynchburg, Virginia; James W. Evans, CHOATE, HALL & STEWART LLP, Boston,

Massachusetts, for Appellees.  **ON BRIEF:** Francis H. Casola, Erin B. Ashwell, WOODS ROGERS, PLC, Roanoke, Virginia, for Appellant. Robert P. Silverberg, Claire L. Shapiro, SILVERBERG, GOLDMAN & BIKOFF, LLP, Washington, D.C.; J. Barrett Lucy, FREEMAN, DUNN, ALEXANDER, GAY, LUCY & COATES, PC, Lynchburg, Virginia, for Appellee C&D Zodiac, Inc.; Mark D. Cahill, Jared M. Barnes, CHOATE, HALL & STEWART LLP, Boston, Massachusetts, for Appellee Neenah Technical Materials, Inc.

_____

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Hanwha Azdel, Inc. ("Azdel"), the manufacturer of a thermoplastic composite sheet product called "Aero-Lite," entered into an agreement with aircraft sidewall manufacturer C&D Zodiac, Inc. ("C&D") to use Aero-Lite to manufacture aircraft sidewalls for American Airlines ("American"). The relationship deteriorated when the Aero-Lite sidewalls did not live up to American's expectations. C&D never paid Azdel for the sheets of Aero-Lite that it ordered or that Azdel delivered while the parties were working together. C&D later found a partner in Crane & Co. ("Crane"), whose product proved successful for use in sidewall manufacturing and met American's expectations.

Azdel filed this lawsuit to recover inter alia 1) the contract price of 144 sheets of 2000 grams-per-square-meter ("gsm") Aero-Lite it delivered to C&D and which C&D forwarded to its forming facility to be molded into sidewalls; 2) the contract price of the remaining sheets of Aero-Lite reflected in C&D's original purchase order; 3) the contract price of eight sheets of a lighter 1320 gsm Aero-Lite product it delivered to C&D; and 4) damages for C&D's disclosure of Azdel's confidential information to Crane. The parties filed cross-motions for summary judgment. The district court denied Azdel's motion and granted C&D's motion in toto. On appeal, Azdel challenges the

3

district court's summary judgment rulings and its denial of Azdel's motion to compel discovery of certain documents from Crane.

We affirm the district court's grant of summary judgment to C&D on Azdel's confidentiality claims, and further rule that the district court did not err in denying Azdel's motion to compel. However, we reverse the district court's grant of summary judgment to C&D because we hold that C&D accepted the 144 sheets of 2000 gsm Aero-Lite by taking actions inconsistent with Azdel's ownership of those sheets; accordingly, we grant summary judgment to Azdel as to this claim. We likewise reverse the district court's grant of summary judgment to C&D regarding Azdel's delivery of the eight sheets of 1320 gsm Aero-Lite and grant summary judgment to Azdel on this claim because C&D accepted these sheets. Finally, we hold that the district court acted prematurely in granting summary judgment to C&D regarding C&D's liability under the original purchase order. Whether C&D terminated is a question that must be resolved by a jury. We therefore affirm in part, reverse in part, and vacate in part the district court's rulings and remand for trial on the termination issue.

I.

A.

4

In March 2008, Azdel and C&D executed a Memorandum of Understanding ("MOU") memorializing the parties' agreement to work together to provide aircraft sidewalls for American Airlines. The MOU was a preliminary agreement that would govern the parties' relationship while they worked to establish a more permanent contract. Azdel was to manufacture sheets made of 2000 gsm Aero-Lite to be molded by C&D into aircraft sidewalls for American. The MOU also provided that the parties would work together to develop a "next-generation Aero-Lite material" and set out a development schedule for that product. J.A. 2186. The parties "anticipate[d] a 20-year commitment . . . during which AZDEL [would] offer C&D exclusivity of supply for" various programs. J.A. 2185 ¶¶ 2-3. Azdel also agreed to provide C&D with "Most Favored Pricing." J.A. 2186 ¶ 5.

The parties agreed that Azdel would manufacture 2000 gsm Aero-Lite according to a "Specification" prepared by C&D and modified as a result of feedback from Azdel. The Specification was "fairly generic" and labeled as proprietary to C&D. J.A. 2033-35. Azdel warranted only that its product would comply with the Specification and expressly disclaimed any warranty of fitness for a particular purpose. Indeed, Paragraph 9 of the agreement stated in no uncertain terms:

> The Parties agree that suitability of the Product for the American Airlines 757 program has been extensively tested and investigated. <u>AZDEL warrants only that</u>

5

> Products sold to C&D will conform to C&D's specifications in effect at the time of manufacture and agreed in writing between AZDEL and C&D. AZDEL expressly disclaims any warranty of fitness for a particular purpose.

J.A. 2189-90 ¶ 9 (emphasis added).

The MOU required C&D to provide six-month forecasts of its Aero-Lite requirements because, according to the agreement, "[t]he Parties acknowledge that AZDEL's supply chain requirements for [2000 gsm Aero-Lite] result in long lead times." J.A. 2189. As a result, such forecasts were "binding in that C&D will be committed to later issue a purchase order for not less than the material requirements forecasted." J.A. 2189 ¶ 7.B. Purchase orders were to be issued at least twelve weeks before the anticipated ship date. C&D could make reasonable changes in quantities or delivery dates by issuing notice to Azdel thirty days prior to the expected delivery date. Any other changes to purchase orders that came with less than thirty days' notice were subject to acceptance by Azdel.

Azdel retained "[t]itle to any shipment of the Products" until C&D paid "all sums due to Azdel for that shipment, or until the Product is no longer in sheet form." J.A. 2189 ¶ 8.B.

While the MOU severely limited the extent of Azdel's warranties, C&D was protected by broad termination rights, as laid out in Paragraph 11 of the agreement:

6

C.   C&D shall have the right to terminate this MOU as well as any open orders in connection thereto if:  (i) the material does not perform as predicted and is deemed not suitable for C&D's intended use, conversion, or processing; and C&D has given the required 60 days' notice and/or (ii) the customer requests C&D to switch back to conventional material/manufacturing methods.

J.A. 2190 ¶ 11.

In addition to establishing the parties' rights and obligations regarding the purchase and delivery of 2000 gsm Aero-Lite, the MOU required the parties to maintain confidentiality regarding certain information.  Paragraph 12 of the MOU provided that the MOU itself would remain confidential, and referenced a "separate" "Confidentiality and Non-Disclosure Agreement" ("NDA") that would govern certain other confidentiality obligations.  J.A. 2191 ¶ 12.  The NDA prohibited the parties from disclosing confidential information "conspicuously labeled" as such by the party seeking to prohibit disclosure.  J.A. 2194.  The extensive list of materials that was subject to non-disclosure included "costs and pricing" and "prototypes."  J.A. 2194.  Information "in the public domain," however, was not protected.  J.A. 2195.

B.

On April 8, 2008, C&D issued a purchase order for 2900 sheets of 2000 gsm Aero-Lite, with deliveries staggered over eight months (the "Original Purchase Order").  The Original Purchase Order called for an initial 40-sheet delivery on June

7

11, 2008; a 110-sheet delivery on July 1, 2008; and a 550-sheet delivery on October 1, 2008. The order identified the initial 40-sheet delivery as a "PRE-PRODUCTION REQUIREMENT." J.A. 2350. The 110 sheets scheduled for delivery on July 1st were labeled as "FOR AUG. AND SEPT. REQUIREMENT." J.A. 2350. According to Chris Willis, Azdel's project manager for Aero-Lite, the "pre-production" label reflected that to determine the suitability of Azdel's Aero-Lite sheets for American, C&D would have to mold some sheets into sidewall panels, perform initial tests, and present a sample sidewall to American for further testing. C&D employees shared that understanding.

On June 5, 2008, Azdel delivered a total of 144 sheets to C&D. Without testing the sheets for conformity with the Specification, C&D's Quality Department forwarded the sheets on to C&D's forming facility to be molded into sidewalls. C&D employees testified that C&D's Quality Department did not perform tests to determine whether to reject the product because it believed the sheets of Aero-Lite were "samples, outside of production requirements." J.A. 2023.

At some point, C&D determined that the sheets Azdel delivered were warped. The sheets were varyingly described as having "an extreme 'saddle' type curl," J.A. 2515, and "severely twisted," J.A. 1706. C&D hoped that the application of heat and pressure during the molding process would mitigate the warpage

8

problem and proceeded to mold some of the sheets of Aero-Lite into sidewalls. Unfortunately, as one Azdel employee put it, the "[w]arped sheets mold[ed] into warped parts." J.A. 1114.

C&D took a sample sidewall to American for a fit check in late June 2008. Jay Zoller of American outlined eleven issues with C&D's product, including the fact that the panels were "slightly twisted" and too heavy. J.A. 1704. Zoller asked C&D to provide American with an action plan to address the issues he identified. C&D sent a Change Request to American, asking that existing Aero-Lite sidewalls be used in place of C&D's conventional "crushcore" product that C&D had previously manufactured and used until a lighter weight Aero-Lite product could be developed. The request was never signed by American. C&D thus returned to providing conventional crushcore panels to American.

On July 2, 2008, C&D sent a detailed e-mail to Azdel outlining American's problems with the sidewalls and noting that the 2000 gsm sheets of Aero-Lite "definitely can not be used for sidewall production." J.A. 886. The e-mail also stated that C&D was "investigating a number of projects to find a more suitable application for [the 2000 gsm] sheets." J.A. 886. C&D further indicated that it would "continue to work with Azdel on processing the curled material as time permits so that we all

9

get a better understanding of it, and can eliminate [the curl]." J.A. 887.

When asked about the status of the October delivery by other Azdel employees, Willis of Azdel stated "C&D has not committed to taking anyone [sic] 2000 gsm at this time. . . . All of this product should be put on hold." J.A. 1480. According to Willis, he had this impression based on previous conversations with C&D personnel. Other employees at Azdel believed that the purchase order had not been terminated, stating, "If they want to cancel their current orders they must update their release. All orders remain valid until the customer cancels or revises their release." J.A. 1478. In response to Azdel's request for a clarification of the status of the order, C&D issued a revised purchase order on September 17, 2008, zeroing out all installments with a "0.00" notation (the "Revised Purchase Order"). J.A 2353-54.

Twelve days later, C&D generated reports indicating that the 2000 gsm Aero-Lite had been nonconforming, i.e., did not meet the Specification. But C&D never provided those reports to Azdel.[1]

Thereafter, Azdel manufactured some lighter weight sheets of Aero-Lite, and C&D molded and tested several of these

---

[1] C&D conceded below that whether Azdel's product conformed to C&D's specifications is a disputed issue of material fact.

10

iterations.  On April 24, 2009, C&D ordered twenty sample sheets of 1320 gsm Aero-Lite based upon a single $15,000 price for the entire lot.  In September 2008 and April 2009, Azdel issued sample quotations and pricing letters for C&D's purchase of 1320 gsm Aero-Lite.  The pricing letter and quotations were all marked confidential.

Azdel manufactured more than fifty sheets of the 1320 gsm product but found only eight sheets worthy of delivery.  C&D formed these sheets into panels and informed Azdel that the panels were tested "under American Airlines conditions" and "passed."  J.A. 957.  When C&D inquired as to whether Azdel would produce the remaining sheets required by the twenty-sheet order, Azdel indicated that it would not produce any more sheets.  C&D could not complete its full qualifications process without a full delivery.  Azdel billed C&D $6000 for those sheets on a per sheet basis in August 2009.  C&D told Azdel it would pay for them after they were approved by American.  Azdel never received payment for the eight sheets it delivered.

C.

On October 30, 2009, C&D contacted Crane regarding development of a product that would meet American's expectations.  Crane produced a product similar to Aero-Lite called Composite Aerospace Board ("CAB") that ultimately proved acceptable to American.

11

C&D provided Crane with the same or a similar version of C&D's specifications that had been attached to the MOU. In addition, during C&D's negotiations with Crane, it provided Crane with a spreadsheet entitled "Historic Pricing Board." The spreadsheet contained tiered pricing for various quantities of product at various weights. Some of the prices were the same or similar to prices that appeared in Azdel's pricing letters that had been marked confidential. C&D's historic pricing for the 1300 gsm product in certain quantities was the same as Azdel's pricing for Aero-Lite, but pricing for the 1300 gsm product in other quantities differed. The historic pricing board also included prices for 1200 gsm and 2000 gsm products not reflected in Azdel's pricing letters.

In March 2010 Crane provided C&D a report of Crane's testing of its CAB product. The report reflected that CAB had been tested against a sheet of Azdel's 1350 gsm Aero-Lite, a separate product ordered by C&D from Azdel in October 2008. C&D at times referred to 1320 gsm as 1350 gsm because certain steps in processing resulted in a weight increase. On the other hand, the photographs attached to the testing report identify the Azdel product as 1500 gsm. The Crane witness who authored the report testified that the Azdel product tested had been "a commercially available" product. J.A. 1902-03. There is no

12

evidence that the panel or shipping papers associated with it were marked confidential.

### D.

Azdel's original complaint raised three causes of action for breach of contract alleging that C&D failed to pay Azdel for Aero-Lite sheets pursuant to the MOU (Counts I-III). Count I alleged that C&D failed to pay Azdel for the 144 sheets of Aero-Lite delivered under the Original Purchase Order, and for undelivered but manufactured sheets produced pursuant to that purchase order. Count II alleged in the alternative that if C&D did terminate the MOU and open purchase orders, C&D was obligated to reimburse Azdel for raw materials, work in process, and finished goods on hand at the time of the termination in accordance with Paragraph 11.D of the MOU.[2] Count III sought $6000 in compensation for the sample sheets of 1320 gsm Aero-Lite that Azdel provided pursuant to an April 24, 2009 purchase order.

Following discovery, Azdel amended its complaint to include two additional causes of action (Counts IV and V), alleging that C&D breached confidentiality provisions contained in the MOU and the parties' non-disclosure agreement. The district court

---

[2] Azdel makes no effort to challenge the district court's dismissal of Count II on appeal.

13

bifurcated the damages portion of Counts IV and V from liability issues.

Azdel supplemented its discovery requests, now seeking discovery from Crane. Over the course of discovery, Crane withheld or redacted certain documents it alleged were subject to the common interest privilege pursuant to a common legal interest it held with SABIC, a non-party that supplied resin to Azdel throughout the development of Aero-Lite. Azdel moved to compel production of these documents. A magistrate judge denied Azdel's objection, and the district court adopted the magistrate judge's recommendation, holding that "the record is sufficient to establish that the disputed documents were communicated in furtherance of a common legal interest between Crane and SABIC." J.A. 1255.

The parties filed cross-motions for summary judgment. The district court granted C&D's motion as to all counts and denied Azdel's motion. This appeal ensued.

II.

We review the grant or denial of a motion for summary judgment de novo, drawing all inferences in favor of the nonmoving party. Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011). Summary judgment may be granted only where "there is no genuine dispute as to any material fact and the

14

movant is entitled to judgment as a matter of law." Libertarian Party of Va. v. Judd, 718 F.3d 308, 312–13 (4th Cir. 2013) (internal quotation marks omitted). A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

This matter is in federal court on diversity jurisdiction pursuant to 28 U.S.C. § 1332. The parties agree that Virginia law applies to Azdel's claims arising from the MOU and related purchase orders, and that California law applies to Azdel's claims under the NDA.[3]

A.

We first address Azdel's contention that C&D violated the MOU's confidentiality provision and the NDA by disclosing confidential information to Crane during its development of CAB, Crane's alternative to Aero-Lite.

1.

Azdel first argues that C&D breached the NDA by disclosing Azdel's confidential pricing information to Crane. There is no question that the "Historic Pricing Board" that C&D provided

---

[3] The NDA's choice of law provision provides that it shall be construed in accordance with California law.

15

Crane contained prices that were the same or similar to prices contained in two of Azdel's pricing letters, each of which was labeled "confidential." J.A. 2363, 2398. Nor is there any question that the NDA prohibited C&D from disclosing "cost and pricing" information that Azdel marked as confidential. J.A. 2194 ¶ (C).

Yet the pricing board was not a reflection of past prices; rather, it was an indication of what C&D would be willing to pay for Crane's product. Nothing in the parties' agreements prohibited C&D from indicating to third parties what it would be willing to spend.[4] To the extent the pricing board contained historic prices, C&D did not disclose that they were Azdel's. And while several of the prices that C&D gave Crane were the same as Azdel's, others were not. Thus, we find no error in the district court's ruling that C&D did not disclose Azdel's confidential pricing information in violation of the NDA.

2.

Azdel next contends that C&D violated the NDA by giving Crane a sheet of Azdel's prototype 1320 gsm Aero-Lite so that it

_____

[4] We do not mean to suggest that a company's pricing scheme cannot be the subject of a confidentiality agreement. We hold only that no violation of the NDA occurred here, where disclosure of prices that partially aligned with Azdel's was incidental to C&D's pricing negotiations.

could be tested against Crane's CAB. The parties dispute whether C&D provided a prototype 1320 gsm sheet of Aero-Lite or a 1350 gsm sheet of commercially available material.

As an initial matter, there is no evidence in the record to suggest that any of the 1320 gsm sheets of Aero-Lite or any of the shipping papers accompanying the 1320 gsm sheets that Azdel delivered to C&D identified the sheets as confidential prototypes. The only document marked confidential in connection with the 1320 gsm sheets is an internal order form for the 1320 gsm sheets. However, that order form also described the 1320 gsm sheets as "commercial." J.A. 2543.

Azdel argues that the parties did not intend for the prototype sheets of Aero-Lite themselves to be marked as confidential, noting that C&D's plant manager testified that he would not expect a confidential prototype to be stamped with the word "confidential." Azdel would thus read out of the NDA the requirement that "Confidential Information . . . shall at all times be conspicuously labeled by the disclosing Party as 'Confidential,'" or read into it an exception for "prototypes." J.A. 2194.

Even assuming that such an exception could be read into the NDA, the evidence in the record does not support an inference that the sheet tested by Crane was a prototype sheet of 1320 gsm. Crane's testing report identified the sheet as "1350 gsm"

17

not "1320 gsm," and the photographs attached to the testing report identify the Azdel product as "1500 gsm." J.A. 1031. While a Crane employee testified that he could not recall the weight of the Aero-Lite sheet tested, he did recall that it was "commercially available." J.A. 1902-03. Furthermore, though there is evidence in the record suggesting that C&D had, at times, referred to Azdel's 1320 gsm as 1350 gsm, this alone would not support a reasonable inference that the sheet tested by Crane was in fact 1320 gsm.[5]

In sum, based on this record, no reasonable juror could conclude that C&D's disclosure of Azdel's product violated the NDA. We therefore hold that the district court did not err in granting summary judgment for C&D on this claim.

3.

Finally, Azdel argues that C&D violated its confidentiality obligations by disclosing specifications similar to the Specification referenced in the MOU. Azdel concedes that it failed to mark the Specification confidential and, therefore,

---

[5] Azdel also argues that the 1350 gsm Aero-Lite was also not commercially available and was therefore covered under the NDA. This argument has been made for the first time on appeal and is therefore waived. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998) ("We have repeatedly held that issues raised for the first time on appeal generally will not be considered.").

that the Specification does not receive protection under the NDA. However, Azdel contends that the Specification is nonetheless covered by Paragraph 12 of the MOU, which bars disclosure of "this MOU." J.A. 2191 ¶ 12. Because the Specification was referenced in and attached to the MOU, Azdel reasons that it is a part of the MOU for purposes of Paragraph 12.

In support of this argument, Azdel cites <u>Countryside Orthopaedics, P.C. v. Peyton</u>, in which the Supreme Court of Virginia stated, "where two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument." 541 S.E.2d 279, 284 (Va. 2001) (internal quotation marks omitted). This uncontroversial statement of Virginia contract law has no bearing on whether the Specification is subject to the MOU's confidentiality provision. <u>Countryside Orthopaedics</u> was merely referencing the familiar maxim that "[w]here a business transaction is based upon more than one document executed by the parties, the documents will be construed together to determine the intent of the parties." <u>Id.</u> (internal quotation marks omitted).

19

The question before us is not whether the MOU and the Specification ought to be construed alongside one another as part of the same transaction. Rather, the success of Azdel's claim hinges on whether, by using the term "MOU" in Paragraph 12, the parties intended to allow Azdel to prevent disclosure of C&D's specifications. We conclude that they did not.

Crucially, the Specification was conspicuously marked as proprietary to C&D and included the following disclaimer: "THE INFORMATION CONTAINED HEREIN MUST NOT BE REPRODUCED OR COPIED OR OTHERWISE DISCLOSED IN WHOLE OR IN PART WITHOUT THE WRITTEN APPROVAL OF C&D ZODIAC, INC." J.A. 2198. In fact, the MOU refers to the Specification as "C&D's specifications." 2189 ¶ 9. In addition, Paragraph 12 of the MOU refers to attachments to the MOU as "separate" from the MOU. For example, Paragraph 12 provides, "Refer to Attachment 'A' for details in the form of a separate Confidentiality and Non-Disclosure Agreement between the Parties." J.A. 2191 (emphasis added).[6]

In sum, it is clear that the parties did not intend for the term "this MOU" to apply to C&D's specifications. Thus, the district court correctly held that disclosure of C&D's

---

[6] Because we hold that C&D did not breach its confidentiality obligations to Azdel, we need not reach the issue of whether the district court erred in dismissing Azdel's claims for failure to put forward evidence that C&D's breach caused actual damages.

20

specifications did not violate the MOU's confidentiality provision.

B.

We next address Azdel's claim that it is entitled to the contract price of the 144 sheets of 2000 gsm Aero-Lite it shipped to C&D and which C&D forwarded to its forming facility to be molded into aircraft sidewalls.

Generally, where a buyer accepts goods but does not pay for them, the seller is entitled to recover the contract rate for the goods. See Va. Code § 8.2-607(1) ("The buyer must pay at the contract rate for any goods accepted."); id. § 8.2-703 (remedies of seller); see also Green Hill Corp. v. Greenko Corp., 891 F.2d 286 (4th Cir. 1989) (unpublished). Under the Virginia Uniform Commercial Code, acceptance of goods occurs when the buyer

> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

> (b) fails to make an effective rejection, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

> (c) does any act inconsistent with the seller's ownership . . . .

Va. Code § 8.2-606(1).

A reasonable inspection may occur "at any reasonable place and time and in any reasonable manner," id. § 8.2-513(1), and

21

the "place or method of inspection" may be "fixed by the parties." Id. § 8.2-513(4).

Notably, Official Comment 4 to Va. Code § 8.2-606 states that "the provisions of paragraph (c) are subject to the sections dealing with rejection by the buyer which permit the buyer to take certain actions with respect to the goods pursuant to his options and duties imposed by those sections, without effecting an acceptance of the goods." In other words, where a buyer's reasonable inspection would be otherwise inconsistent with the seller's ownership of the goods, such inspection on the part of the buyer will not be deemed an acceptance. However, the meaning of "inspection" is limited to "the buyer's check-up on whether the seller's performance is in accordance with [the parties'] contract." Official Comment 9 to § 8.2-513.

Azdel contends that when C&D's quality department forwarded the sheets of Aero-Lite to its forming facility to be molded into sidewalls, C&D acted inconsistently with Azdel's ownership of the sheets and thereby accepted them. We agree.

C&D's molding of the sheets of Aero-Lite was clearly inconsistent with Azdel's ownership of the Aero-Lite sheets. Molding the Aero-Lite into sidewalls was a substantial modification that irreversibly altered the condition of Azdel's product. Moreover, the parties contemplated that the molding of the sheets of Aero-Lite constituted a point of no return with

22

respect to ownership of Azdel's product. Azdel lost title as soon as they were no longer in sheet form. See J.A. 2189 ¶ 8 (stating that title to Azdel's product will remain with Azdel until the "Product is no longer in sheet form"). Virginia precedent supports this conclusion. See, e.g., Moore & Moore General Contractors, Inc. v. Basepoint, Inc., 485 S.E.2d 131, 133 (Va. 1997) (holding that a contractor's installation of nonconforming cabinets constituted an act inconsistent with subcontractor's ownership and amounted to acceptance of goods); see also Laurence Anderson on the Uniform Commercial Code 3d., § 2-606:64 "Modification of Goods" ("When the buyer has not rejected the goods and has made a substantial modification to them, the buyer is deemed to have accepted the goods.").

The only way that C&D would not be required to pay for the delivered sheets of 2000 gsm Aero-Lite is if its actions in molding the sheets into sidewalls and presenting them to American for a fit check constituted a reasonable inspection of the goods, or if such a method of inspection was "fixed by the parties." Va. Code § 8.2-513(4). Below, the district court concluded that "where [C&D] was not otherwise allowed to fully test any Aero-Lite sheets, the type of reasonable inspection agreed upon by the parties included the molding trials that Defendant conducted as well as the fit check to see how the molded sheets would perform upon installation." J.A. 2159. The

23

district court relied in large part on the fact that the purchase order issued by C&D states that the first scheduled delivery of Aero-Lite was for "PRE-PRODUCTION," and that the parties understood that "pre-production" was a term designed to allow C&D to internally evaluate the product and allow American to sign off on the product. J.A. 2157. Thus, according to the district court, actions taken by C&D that were inconsistent with Azdel's ownership of the goods did not effect an acceptance because C&D had not yet had the opportunity to conduct a reasonable inspection.

Regardless of whether the initial delivery of Aero-Lite was necessary for C&D to determine the suitability of Azdel's product for its own internal process or for American, the pre-production requirement has no bearing on whether the product that Azdel delivered to C&D conformed to the parties' contract, i.e., complied with the Specification. Under the Virginia UCC, C&D's reasonable inspection of Azdel's product was limited to determining whether the delivered sheets of 2000 gsm Aero-Lite conformed to the Specification. It does no good to say that C&D's molding of the sheets of Aero-Lite into sidewalls did not constitute an acceptance because "[C&D] was not otherwise allowed to fully test any Aero-Lite sheets." J.A. 2159. To the contrary, the parties stipulated in their agreement that the suitability of Azdel's product had been extensively tested.

24

There is also no indication in the record that C&D would have been prevented from testing the 2000 gsm sheets of Aero-Lite to determine whether it complied with the Specification before molding them into sidewalls. To permit C&D to condition its acceptance of Azdel's product on its determination that the product is suitable to American would entirely eviscerate the MOU's warranty provision and the parties' bargained-for allocation of risk.

The decision of the Supreme Court of Virginia in Twin Lakes Manufacturing Co. v. Coffey, a case relied upon by C&D on appeal and cited by the district court below, is inapposite. 281 S.E.2d 864 (Va. 1982). In Twin Lakes, the court held that, given the existence of latent structural defects in a mobile home, the buyers of the mobile home did not waive the implied warranty of merchantability when they installed the mobile home. Id. at 866–67 (applying Va. Code. § 8.2-316(3)(b) ("[W]hen the buyer before entering into the contract has examined the goods . . . there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.")). The court did not remotely address the question presented in this case: whether a buyer who irreversibly modifies goods before inspecting them for compliance with the buyer's own specifications accepts those goods under the Virginia UCC.

25

Lastly, while provisions in the MOU permitted C&D to terminate the MOU as well as any purchase orders in the event that "the material does not perform as predicted and is deemed not suitable for C&D's intended use, conversion, or processing," J.A. 2190 ¶ 11.C, C&D's termination rights under the MOU do not alter its obligations with respect to delivered goods under the Virginia UCC.

Thus, the district court erred in denying Azdel's claim regarding the 144 sheets of delivered 2000 gsm Aero-Lite.

## C.

Azdel also contends that C&D is liable for the sheets of Aero-Lite it ordered pursuant to the Original Purchase Order. The district court held that C&D terminated the Original Purchase Order on July 2, 2008, when Del Pinto of C&D e-mailed Willis of Azdel following the disappointing fit check. In the alternative, the district court held that C&D terminated the Original Purchase Order on September 17 when it issued a revised purchase order zeroing out all quantities of 2000 gsm Aero-Lite.[7]

---

[7] C&D also appears to contend in its briefs that the MOU itself and perhaps any open purchase orders "self-terminated" pursuant to what it terms the MOU's "self-termination provision." Paragraph 6 of the MOU provides that "This MOU shall begin on the Effective Date and shall remain in force for the duration of the American Airlines 757 Program or until a long-term agreement is executed between the Parties, whichever occurs first." J.A. 2188 ¶ 6. C&D implies that the MOU self-terminated as of the time American expressed dissatisfaction with the 2000 gsm Aero-Lite sidewalls, i.e., after the fit

26

1.

To determine whether C&D terminated the Original Purchase Order, we must first assess whether the preconditions for termination under the contract were met—whether C&D had the right to terminate the Original Purchase Order in the first place.[8] The MOU gave C&D "the right to terminate this MOU as well as any open orders in connection thereto if: (i) the material does not perform as predicted and is deemed not suitable for C&D's intended use, conversion, or processing, and C&D has given the required 60 days' notice and/or (ii) the customer requests C&D to switch back to conventional material/manufacturing methods." J.A. 2190 ¶ 11.C. The district court concluded that both conditions were met in this

_____

check. Yet there is nothing in the MOU to suggest that American's failure to immediately accept the sidewalls would constitute an end to the American Airlines 757 Program. Thus, C&D's reliance on the self-termination provision is misplaced.

[8] In addition to arguing that the preconditions for termination were not met in this case, Azdel contends that Paragraph 11 of the contract only permitted C&D to terminate the MOU in conjunction with any purchase orders. According to Azdel, C&D and Azdel went on to produce 1320 gsm Aero-Lite under the terms of the MOU, and therefore, "[b]y letting [C&D] walk away from the 2000GSM Aero-Lite purchase order when it was not walking away from the agreement," we would be permitting C&D to "have its cake and eat it too." Appellant's Br. at 57. Azdel's restrictive reading of paragraph 11.C is untenable. This provision gave C&D the right to terminate the MOU and any open purchase orders in connection with the MOU. It does not state that C&D may terminate open purchase orders only when it terminates the MOU.

case. We will address each precondition for termination separately.

a.

We first consider whether Azdel had the right to terminate the MOU as well as any open purchase orders under Paragraph 11.C(i). That right hinges on a determination of whether Azdel's product "did not perform as predicted and is deemed not suitable for C&D's intended use." J.A. 2190 ¶ 11.C(i).

Azdel contends that Paragraph 11.C(i) permitted C&D to terminate the Original Purchase Order only if its product failed to meet the requirements of the Specification. The plain language of the MOU simply does not support Azdel's interpretation. Notwithstanding the fact that the MOU provides that "the parties agree that the suitability of the Product for American Airlines 757 program has been extensively tested and investigated," J.A. 2189 ¶ 9, Paragraph 11.C(i) clearly contemplates that C&D may "deem" Azdel's product nonetheless unsuitable. Had the parties intended to limit C&D's termination rights to an instance in which Azdel's product failed to comply with the Specification, they easily could have done so. They did not. Thus, C&D was permitted to terminate the MOU and open purchase orders even where Azdel's product satisfied the Specification if it determined that the product did not perform as predicted and C&D deemed it unsuitable.

28

Contrary to Azdel's assertions, the record establishes that Azdel's 2000 gsm Aero-Lite did "not perform as predicted" and was "not suitable for C&D's intended use, conversion, or processing." J.A. 805. Though C&D hoped that molding the Aero-Lite into sidewalls might ameliorate the warpage problem and notwithstanding the prior extensive testing done on the product, the warped Aero-Lite resulted in warped sidewalls that were unsuitable for American's use.

b.

We next consider whether C&D had the right to terminate the Original Purchase Order under Paragraph 11.C(ii) of the MOU, which gives C&D the right to terminate any open purchase orders in the event that "the customer requests C&D switch back to conventional material/manufacturing methods." J.A. 2190. In contrast to Paragraph 11.C(i), the termination rights conveyed by Paragraph 11.C(ii) do not require sixty days' notice.

Azdel argues that American did not "request" that C&D "switch back" to using conventional materials under Paragraph 11.C(ii). While conceding that American never affirmatively requested C&D to switch back to crushcore, C&D nonetheless suggests that the term "requests" should be given a broader meaning. After the fit check, American gave C&D feedback and required C&D to create an action plan that, among other things, reduced the weight of the product. By requiring a

29

product of a different weight, C&D contends American was essentially requesting that C&D revert to crushcore. C&D also points to the fact that American had the "ultimate" decision of what product it would use in its aircraft. J.A. 736. In other words, according to C&D, because American took actions that resulted in C&D reverting back to crushcore, and because American ultimately had discretion as to whether to use crushcore in its planes, American did in fact, in some sense of the word, "request" that C&D "switch back" to crushcore.

C&D ignores uncontested evidence in the record precluding such a holding. Indeed, American's own employee testified that American did not make the decision to reject Aero-Lite, rather, it "assumed [C&D] determined that it would not meet our needs, because they changed materials." J.A. 1653. Furthermore, it was C&D that proposed it have crushcore on hand in the event that the Aero-Lite material did not meet American's expectations, and it was C&D's choice to supply crushcore while Aero-Lite was being developed. Given the extent of C&D's influence on the decision to use crushcore while Aero-Lite development continued, it can hardly be said that American "requested" that C&D "switch back" to conventional manufacturing methods within the meaning of the MOU. American was open to accepting an Aero-Lite based product that met its needs.

Because C&D did not have termination rights under Paragraph 11.C(ii), it could not terminate the Original Purchase Order without giving Azdel sixty days' notice of its intent to do so.

2.

We must next consider whether C&D provided an effective notice of termination under the Virginia UCC. The district court concluded and C&D maintains that effective notice of termination was given on July 2, 2008, when Del Pinto of C&D sent an e-mail to Willis of Azdel stating among other things that Azdel's 2000 gsm sheets of Aero-Lite "definitely can not be used for sidewall production" and, at the very least, on September 17, 2008, when C&D issued its revised purchase order zeroing out all ordered quantities of Azdel's product.

Under the Virginia UCC, "[a] person 'notifies' or 'gives' a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it." Va. Code § 8.1A-202(d). In conducting this analysis at the summary judgment stage we must be mindful that under the UCC, courts typically reserve questions of reasonableness for the finder of fact. See, e.g., Zidell Explorations, Inc. v. Conval Int'l, Ltd., 719 F.2d 1465, 1473–74 (9th Cir. 1983) (reasonableness of notice of termination to be decided by jury); St. Ansgar Mills, Inc. v. Streit, 613 N.W.2d

31

289, 295 (Iowa 2000) (collecting cases, from various jurisdictions, holding that the determination of reasonableness under the UCC is a factual question inappropriate for summary judgment.); cf. Flowers Baking Co. of Lynchburg, Inc. v. R-P Packing, Inc., 329 S.E.2d 462, 466-67 (Va. 1985) (whether rejection based on nonconforming goods occurred within a reasonable period of time is a question for the jury).

### a.

We first address the July 2 e-mail. C&D did not state in its July 2 e-mail that it was terminating the Original Purchase Order and in fact made no reference to that order whatsoever. The e-mail even alluded to other uses for the product, indicating that C&D was "investigating a number of projects to find a more suitable application for [the 2000 gsm] sheets." J.A. 886. The e-mail also stated that C&D would "continue to work with Azdel on processing the curled material." J.A. 887.

We recognize that some evidence suggests a termination. Willis of Azdel believed that C&D had not committed to additional sheets of Aero-Lite based on conversations he had had with C&D personnel. Specifically, Willis stated that he "knew the customer no longer wanted the product" "based on communications that had taken place . . . with Danny Martin." J.A. 699. When asked about the status of the October delivery by other Azdel employees, Willis stated "C&D is not committed to

32

taking anyone [sic] 2000 gsm at this time. . . . All of this product should be put on hold." J.A. 1480. However, others at Azdel believed C&D remained committed to its orders of 2000 gsm Aero-Lite, stating, "If they want to cancel their current orders they must update their release. All orders remain valid until the customer cancels or revises their release." J.A. 1478.

In sum, one could conclude from the July 2 e-mail that C&D wanted Azdel to treat the Original Purchase Order as having been terminated. However, we are not convinced that this is the only reasonable interpretation of the e-mail and the surrounding circumstances. We thus conclude that the district court acted prematurely in removing this question from the province of a jury.

b.

On the other hand, we agree with the district court that the Revised Purchase Order issued on September 17 effectively terminated the Original Purchase Order. That document inserted "0.00" as the amount due in connection with each delivery, added "*** THIS LINE HAS BEEN REVISED ***" before each listed line item, and in connection with all deliveries other than those already delivered, stated, "CANCEL ORDER." J.A. 2354. There is only one way to read these changes to the purchase order.

Because we concluded above that C&D only had the right to terminate the Original Purchase Order pursuant to 11.C(i), the

33

Revised Purchase Order is only effective, as a termination, sixty days after it was issued. The district court concluded that if the Revised Purchase Order was the only valid termination of the Original Purchase and the sixty-day notice requirement applied, C&D would be liable for "December 2008 through February 2009 deliveries totaling 1,650 sheets" but that "Defendant would not be liable for the cost of the final 1,650 sheets." J.A. 2165. In the event that a jury concludes that C&D's July 2 e-mail did not constitute effective notice of termination, we agree that C&D will be liable under the Original Purchase Order in accordance with the district court's assessment.

D.

Under Count III of the Complaint, Azdel seeks to recover $6000 billed to C&D for the eight sheets of 1320 gsm Aero-Lite delivered to C&D in August 2009. C&D contends that it has no obligation to pay for this partial delivery of eight out of twenty ordered sheets because the purchase order for the 1320 gsm Aero-Lite was based upon a single $15,000 price for the entire lot, and Azdel failed to complete the order.

Under Va. Code § 8.2-601, "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest." Under

34

Section 8.2-607(2), "[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this title for nonconformity."

C&D contends that its order for twenty sheets of Aero-Lite constituted a "commercial unit" under the UCC. The mere fact that the sheets were priced as a batch of twenty, however, does not render them a commercial unit. Further, C&D's contention that the twenty sheets were a unit is belied by the fact that it told Azdel it was merely awaiting final approval from American to "release Azdel for production," J.A. 957, and that it would pay for the 1320 gsm sheets when they received approval from American.

C&D never rejected the eight sheets of Aero-Lite that Azdel delivered. It formed them into sidewall panels, tested them, and promised to pay for them after they received American's approval. Under these circumstances, C&D must pay for the eight sheets of 1320 gsm that it accepted.

Finally, Azdel appeals the district court's denial of Azdel's motion to compel certain Crane documents that the district court deemed protected under the common interest privilege. We review factual findings as to whether a privilege applies for clear error, and the application of legal principles de novo. In re Grand Jury Subpoena, 341 F.3d 331, 334 (4th Cir. 2003).

"The joint defense privilege, an extension of the attorney-client privilege, protects communications between parties who share a common interest in litigation." In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 341 (4th Cir. 2005) (citing United States v. Schwimmer, 892 F.2d 237, 243–44 (2d Cir. 1989)). The privilege allows "persons with a common interest to 'communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.'" Id. (quoting In re Grand Jury Subpoenas 89-3 and 89-4, John Doe 89-129, 902 F.2d 244, 249 (4th Cir. 1990)). The proponent of the privilege has the burden to establish that the parties had "some common interest about a legal matter." Sheet Metal Workers Int'l Ass'n v. Sweeney, 29 F.3d 120, 124 (4th Cir. 1994).

Importantly, "it is unnecessary that there be actual litigation in progress for this privilege to apply." United States v. Aramony, 88 F.3d 1369, 1392 (4th Cir. 1996). Indeed

36

we have recognized that "[w]hether an action is ongoing or contemplated . . . the rationale for the joint defense rule remains unchanged." In re Grand Jury Subpoenas 89-3 and 89-4, John Doe 89-129, 902 F.2d at 249.

While Azdel does not challenge the existence of a common legal interest between Crane and SABIC,[9] it argues that Crane failed to establish that it had a "joint legal strategy" with SABIC. Appellant's Br. at 31. Yet we have never held that in order to assert the common legal interest privilege, the party asserting the privilege must put forward evidence establishing the details of a joint legal strategy. Moreover, such a holding would undermine the logic of our prior cases holding that the privilege applies even to actions which are not "ongoing." See, e.g., In re Grand Jury Subpoenas 89-3 and 89-4, John Doe 89-129, 902 F.2d at 249. We therefore affirm the district court's denial of Azdel's motion to compel.

---

[9] Indeed, SABIC received a letter from Azdel outlining claims that Azdel might bring against SABIC. Because those claims implicated Crane's interests, Crane and SABIC entered into a common interest agreement. Thus, there can be no doubt that a common legal interest existed between the two entities.

37

## IV.

For the foregoing reasons, we

AFFIRM IN PART,
VACATE IN PART,
REVERSE IN PART,
AND REMAND.